## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREGORY COMMONS, AARON COMMONS, MAE COMMONS, LINDA CHAPMAN, LISA VANCE, AMBER VANCE, BETTY SPEER, STEPHEN SPEER, SARAH LOSANO, ALORAH LOSANO, LILLIAN LOSANO, MELINDA HERNANDEZ, COURTNEY VARGO, LEIF RETZER, OWEN RETZER, KRISTEN SWEENEY, RYAN SWEENEY, HOLLY REDIMARKER, AIDAN PRICE, WILLIAM MOGENSEN, MARGARET OUELLETTE, JOHN OUELLETTE, JENNIECE FRAISE, JIREH FRAISE, JUANITA FRAISE, JUANITA BEASLEY, JOAN NEAL, TIFFANY ALLEGRETTI, HEATHER KOENIG, RENALD FERNANDEZ, DALE WRIGHT, KEITH KOELE, PAULA FISCUS, ALEXANDRA FISCUS, FELECIA ALEXANDER, REGINALD ALEXANDER, KAREN KELLEY, JOSEPH KELLEY, COLLEEN DUGAN, KARIANNE GOLEMME, SHAWN KELLEY, JEFFREY AXELSON, CHERI SKOP, RHONDA LUCAS, SETH LUCAS, MICHAEL MCGREEVY SR., KATE WILDERN, TIMOTHY BARR, ANDREW HESELTON, CARLA HESELTON, CHARLES HESELTON, GAIL MICHAELS, ELLIOTT LEHMILLER, WILLIAM LEHMILLER, CHIRSTIE NESBIT, ROBERTA MAXWELL, JASON EZERNACK, NANCY PATRICK, SAMANTHA BUNN, DENISE LLOYD, and ROBERT STEYART, | Case No.:  1:25-cv-1344 |

                        Plaintiffs,

      v.

THE ISLAMIC REPUBLIC OF IRAN,

                 Defendant.

## COMPLAINT FOR VIOLATION OF
## THE FOREIGN SOVEREIGN IMMUNITIES ACT

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

THE PARTIES............................................................................................................... 3

JURISDICTION AND VENUE ................................................................................... 4

FACTUAL ALLEGATIONS ....................................................................................... 4

I.   The Iranian Regime Has Created a Vast Infrastructure to Facilitate Terrorist Attacks
     Targeting the United States in the Middle East .................................................... 4

     A.  The Terrorist Sponsors, Acting as Agents of Iran, Have Dedicated Themselves to
         Facilitating Terrorism, Including Attacks Committed by al-Qaeda and the Taliban ... 6

         1.  Foundation for the Oppressed (Bonyad Mostazafan) ...................................... 7

         2.  Islamic Revolutionary Guard Corps ............................................................... 9

         3.  Hizballah ........................................................................................................ 11

         4.  Supreme Leader's Office ............................................................................... 12

     B.  The Terrorist Sponsors Led the "Axis of Resistance" -- A Global Terrorist
         Alliance That Used Proxies to Commit Anti-American Terrorist Attacks................ 15

         1.  Al-Qaeda ......................................................................................................... 18

         2.  The Taliban, including its Haqqani Network.................................................. 21

         3.  Al-Qaeda and the Taliban led a Syndicate of Groups in Afghanistan that
             Committed Anti-American Terrorist Attacks ................................................ 27

     C.  The Terrorist Sponsors Used the Khamenei Cell to Coordinate Attacks .................. 29

II.  The Terrorist Sponsors Enabled Iran to Provide Vital Support to Attacks............................ 32

III. The Terrorist Sponsors Gave Unique and Lethal Aid to the Taliban and al-Qaeda .............. 35

     A.  Al-Qaeda.................................................................................................... 36

     B.  The Taliban (Including its Haqqani Network)............................................................ 49

IV.  Plaintiffs Were Killed Or Injured In Extrajudicial Killings or Hostage Takings By Iranian
     Terrorist Proxies for which Iran Supplied Material Support ................................ 51

     A.  The March 4, 2002 Small Arms Attack in Paktia (Commons Family) ...................... 51

i

B. The May 19, 2002 Small Arms Attack in Paktika (Vance Family) ........................... 52

C. The July 27, 2002 Complex Attack in Khost (Speer Family) ..................................... 53

D. The April 25, 2003 Small Arms Attack in Paktika (Losano Family) ........................ 53

E. The June 25, 2003 Hostile Fire Attack in Paktia (Retzer Family) ............................. 54

F. The October 30, 2003 Hostile Fire Attack in Helmand (Sweeney Family) ............... 55

G. The February 13, 2004 Anti-Tank Mine Attack in Ghazni (Golding Family) ........... 56

H. The May 15, 2004 Complex Attack in Helmand (Price Family) ............................... 56

I. The May 29, 2004 IED Attack in Zabul (Mogensen and Ouellette Families)............ 57

J. The June 7, 2004 IED Attack in Kandahar (Fraise Family) ...................................... 58

K. The August 7, 2004 IED Attack in Ghazni (Beasley Family) ................................... 59

L. The September 20, 2004 Small Arms Attack in Paktika (Wells Family)................... 60

M. The October 14, 2004 IED Attack in Oruzgan (Fernandez Family).......................... 61

N. The January 3, 2005 IED Attack in Kunar (Wright Family) ...................................... 61

O. The March 16, 2005 Land Mine Attack in Herat (Koele Family) ............................. 62

P. The March 26, 2005 IED Attack in Logar (Fiscus Family)....................................... 63

Q. The June 3, 2005 IED Attack in Paktika (Alexander Family) ................................... 63

R. The June 8, 2005 Mortar Attack in Paktika (Kelley Family) .................................... 64

S. The June 28, 2005 Small Arms Attack in Kunar (Axelson Family).......................... 65

T. The June 28, 2005 Helicopter Attack in Kunar (Fontan, Lucas, and McGreevy
Families) ................................................................................................................... 66

U. The July 25, 2005 Small Arms Attack in Oruzgan (Schafer Family)........................ 68

V. The August 11, 2005 IED Attack in Balkh (Heselton Family).................................. 68

W. The August 21, 2005 IED Attack in Zabul (Lehmiller Family) ................................ 69

X. The September 25, 2005 Helicopter Attack in Zabul (Stewart Family).................... 70

Y. The October 9, 2005 Grenade Attack in Zabul (Ezernack Family)............................ 71

Z. The November 22, 2005 IED Attack in Paktia (Steyart Family)................................ 71

CLAIM FOR RELIEF ................................................................................................ 72

PRAYER FOR RELIEF ............................................................................................. 74

## INTRODUCTION

1.      This lawsuit seeks damages under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, against Defendant Iran on behalf of American service members who were killed while serving their country in Afghanistan between approximately 2002 and 2005, and their family members.

2.      These American service members were attacked by terrorists sponsored and supported by the Islamic Republic of Iran ("Iran" or "Iranian regime").

3.      Ever since the 1979 revolution that brought to power Ayatollah Khomeini, the Iranian regime acting through its officials, employees, or agents—including the Foundation for the Oppressed, the Supreme Leader's Office (the "SLO"), and the Islamic Revolutionary Guard Corps ("IRGC")—has sought to export its revolution by sponsoring terrorist attacks targeting the United States in the Middle East. Iran has since led a global terrorist alliance—the "Axis of Resistance"—that sought to use terrorism to undermine American foreign policy, including in Afghanistan.

4.      The attacks that injured Plaintiffs were committed by Iran's terrorist proxies and agents in Afghanistan who were members of the Axis of Resistance: al-Qaeda (including its Military Council in Afghanistan/Pakistan) and the Taliban (including its Haqqani Network).

5.      Plaintiffs seek relief against Iran under the terrorism exception of the Foreign Sovereign Immunities Act, which authorizes any U.S. national, member of the armed forces, U.S. government employee or contractor, or legal representative of such person to recover against a designated State Sponsor of Terrorism for personal injury or death caused by an act of extrajudicial killing, aircraft sabotage, or hostage taking, or the provision of material support or resources to such act, by an official, employee, or agent of the state.

6.      Iran is designated as a State Sponsor of Terrorism and is liable for the attacks that injured plaintiffs.

7.      The attacks were committed by officials, employees, or agents of Iran. Iran also provided material support or resources to the attacks by, among other things, supplying weapons for attacks, training terrorists how to attack Americans effectively, and paying terrorists who killed and injured thousands of Americans.

8.      U.S. Administrations of both parties, on a bipartisan basis, have identified Iran as a key sponsor of terrorism. President Barack Obama, for example, expressed "no illusions" that "the Iranian government … supports terrorist organizations … including proxy groups that threaten our interests," and "for decades," has "always found a way to fund these efforts." Most recently, President Donald Trump reiterated in a February 2025 National Security Presidential Memorandum (NSPM-2) that "Iran's behavior threatens the national interest of the United States" and emphasized its continued aid to "the Taliban, al-Qa'ida, and other terrorist networks, among other malign activities, and accordingly declared it the policy of the United States to exert "maximum pressure" on Iran, including taking "all available legal steps to … help American victims of terrorism, including Gold Star Families, collect on federal judgments against Iran."

9.      It is the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020).

## THE PARTIES

10.     Defendant Iran was designated as a State Sponsor of Terrorism in 1984 pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and has remained so designated ever since.

11.     Iran's officials, employees, or agents included Hizballah, the IRGC, and the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF" or "Qods Force"), Foundation for the Oppressed of the Earth ("Foundation"), Supreme Leader's Office ("SLO"), al-Qaeda, and the Taliban (including its Haqqani Network), among others.  Many of Iran's officials, employees, or agents are themselves designated as Foreign Terrorist Organizations ("FTOs") under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), Specially Designated Global Terrorists ("SDGTs") under 31 C.F.R. § 594.310, or as agencies, instrumentalities, or persons providing material support to such organizations under other authorities.

12.     Plaintiffs are 61 indirect victims of 26 terrorist attacks committed from 2002 to 2005. In this terminology, direct attack victims are those who were physically injured or killed in the attacks. Indirect attack victims are the direct attack victims' close family members who suffered financially and emotionally because of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims. Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[1]

---

[1] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

## JURISDICTION AND VENUE

13.     This Court has personal and subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), and 1605A.

14.     28 U.S.C. § 1605A(c) provides a private right of action against a State Sponsor of Terrorism for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support and resources for such acts. The foreign state is liable for the acts of its officials, employees, and agents acting within the scope of their office, employment, or agency.

15.     Venue is proper in this District under 28 U.S.C. § 1391(f)(4).

## FACTUAL ALLEGATIONS

**I.    The Iranian Regime Has Created a Vast Infrastructure to Facilitate Terrorist Attacks Targeting the United States in the Middle East**

16.     Since the Islamic Revolution overthrew the Shah of Iran in 1979, radical Shia terrorists in the Middle East pledged, before Allah, their personal oath of allegiance not to their own nation, but instead to the Shiite Ayatollah who became the first Supreme Leader of the Islamic Revolution: Ayatollah Ruhollah Khomeini.[2] They pledged to support the Ayatollah's embrace of violent attacks targeting the enemies of the "Islamic Revolution"—most of all, the United States (the "Great Satan") and its allies in the Middle East, including Israel (the "Little

---

[2] In this Complaint, Plaintiffs refer to certain religious concepts and describe those concepts from the perspective of Terrorist Sponsors and their supporters and proxies. The terrorists' understanding of, and use of, religious concepts is vital to understanding their actions, strategies, ideology, doctrine, motivations, linguistic choices, financial practices, rules, tactics, techniques, and procedures. For the avoidance of all doubt, however, Plaintiffs wish to emphasize that nothing in this Complaint should be interpreted as suggesting that the terrorists' interpretations of their Islamic faith is correct as a matter of theological doctrine or representative of the views of the vast majority of Muslims around the world who oppose terrorist violence.

Satan"). The terrorists' shared objective was to force the Great Satan to exit the region and abandon its allies there through an unrelenting campaign of terrorist attacks against Americans.

17.     To advance this core objective of the Islamic Revolution, the Iranian regime developed a vast infrastructure of institutions organized within their government to facilitate terrorist attacks by proxies throughout the region. In its scope, scale, and single-minded focus, this infrastructure amounted to a terrorism machine.

18.     Iran's terrorism machine consisted of three primary components described in this section. First, certain Iranian institutions, which Plaintiffs refer to collectively as Iran's "**Terrorist Sponsors**," were at the center of the terrorism machine: (1) the Foundation for the Oppressed; (2) the Islamic Revolutionary Guard Corps (IRGC), including the Qods Force (often abbreviated IRGC-QF); (3) Hizballah; and (4) the SLO, helmed by Ayatollah Ali Khamenei (the second Supreme Leader of Iran). At all relevant times, the Terrorist Sponsors operated as Iran's most important sponsors of terrorist attacks that targeted the United States. A second key component of the terrorism machine were terrorist groups that acted as Iran's **proxies** for facilitating and committing attacks, collectively known as the "**Axis of Resistance**"—which term Iran devised to emphasize their shared hostility towards the United States. A third component were **joint cells**, which the Terrorist Sponsors used to integrate the components of the terrorism machine, coordinating proxies' terrorist attacks through a joint leadership cell referred to as the Khamenei Cell, as well as various logistics and operations cells.

A. **The Terrorist Sponsors, Acting as Agents of Iran, Have Dedicated Themselves to Facilitating Terrorism, Including Attacks Committed by al-Qaeda and the Taliban**

19.     At all relevant times, the Foundation for the Oppressed, IRGC, Hizballah, the SLO, and each of their members, was an official, employee, or agent of Iran and facilitating terrorist attacks, including attacks committed by al-Qaeda and the Taliban (including its Haqqani Network), was within the scope of their office, employment, or agency.

20.     Under decades of custom and practice, the Terrorist Sponsors closely coordinated with one another and their affiliates to direct proxy attacks led by Hizballah and jointly committed by Hizballah alongside local proxies, which, in Afghanistan, included al Qaeda and the Taliban. The throughline connecting all the Terrorist Sponsors was Ali Khamenei's ideological, doctrinal, and operational support for terrorism, and his control of each Terrorist Sponsor.

21.     On November 6, 2008, Treasury published a fact sheet that emphasized how Iran sponsored terrorist attacks committed by IRGC proxies, including Hizballah, the Taliban, and its al-Qaeda allies in Afghanistan:

**Iran Misuses the International Financial System to Support Terrorism**

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• …. Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, …. The IRGC-Qods Force, which has been designated under Executive Order (E.O.) 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: … Islamic militants in Afghanistan and elsewhere.

6

22.     This support was confirmed by Secretary of State Pompeo on April 8, 2019, when he stated that "[f]or 40 years, the Islamic Republic's Revolutionary Guard Corps has actively engaged in terrorism and created, supported, and directed other terrorist groups."

### 1.     Foundation for the Oppressed (Bonyad Mostazafan)

23.     On March 5, 1979, the SLO and terrorist militias (that would eventually become the IRGC) seized the Pahlavi Foundation – the Shah's global charitable foundation with assets and facilities all over the world – as well as the assets of Jews, Bahais, and other religious minorities, which they pooled together and renamed the Foundation for the Oppressed on Earth, a/k/a *Bonyad Mostazafan* ("Foundation for the Oppressed"). That name boldly announced the new purpose to which they were devoting the Shah's vast wealth: exporting their Islamic Revolution to benefit the "Oppressed on Earth"—which, in practice, translated to terrorist attacks targeting the United States and its allies. For Khomeini, the "Oppressed on Earth" comprised Muslims in countries who needed to be "liberated" through Khomeini-sponsored terrorist violence, and his newly-seized Foundation was intended for that purpose. To that end, Khomeini installed his most trusted terrorist supporters on the board of the Foundation for the Oppressed from inception, including Ali Khamenei. From inception, and ever since, the Foundation has been inextricably connected to, and a vehicle for, the terrorist leaders who provided the muscle for Iran's terrorist agenda.

24.     The Foundation for the Oppressed was custom-built to provide funding, weapons, intelligence support, logistical aid, and a vast transnational footprint of corporate fronts, shell companies, and real estate to the IRGC-QF and Hizballah. This was part of Khamenei's early efforts to build the financial and logistical networks needed to export the Islamic Revolution through Iranian proxy terrorist attacks targeting the United States and its allies, including Israel. Such Khamenei-allied terrorists used the Foundation for the Oppressed to help the IRGC,

Hizballah, and other terrorist proxies acquire funds, weapons (including components), intelligence, cover, concealment, and logistical aid to commit attacks.

25.    Hizballah exercised control of the Foundation alongside the Qods Force and SLO. Hizballah used its control of the Foundation to sponsor terrorist proxy attacks. In March 2001, for example, *BBC* reported that "the Foundation for the Oppressed … is an organization that gives financial support to Iran's … acts of terrorism abroad" that "is supervised by … Ayatollah Khamene'i" and "is a subsidiary of the IRGC" whose investments are "under the control of Hezbollah like other large commercial enterprises in Iran … operating under the supervision of the IRGC" while "under the guise of cultural centres and humanitarian structures." That characterization has remained accurate throughout the period from 2000 through the present.

26.    The Foundation for the Oppressed comprised a terrorist operations slush fund for Hizballah, the Qods Force, and their proxies. Although the Foundation's inner workings were notoriously opaque, its opacity only confirmed its terrorist operations purposes; it was the blackest hole in the Iranian regime, controlled exclusively by Khamenei and his inner circle. The Foundation's role as a terrorist operations slush fund was complemented by the Terrorist Sponsors' custom and practice, and tactics, techniques, and procedures.

27.    Foundation for the Oppressed resources, personnel, and profits were redeployed to Hizballah, the Qods Force, and the SLO; through them, those resources and profits flowed to al-Qaeda and the Taliban (including its Haqqani Network), among others. Those resources and profits included the funding, weapons, intelligence, and logistics that enabled proxy attacks in Afghanistan (committed by al-Qaeda and the Taliban, including its Haqqani Network).

28.     The Foundation for the Oppressed used its resources to fund attack incentive and reward payments, which powered the terrorist attacks committed by al-Qaeda and the Taliban, among others, from at least 2002-2005, and beyond.

29.     The killing power of the Foundation for the Oppressed's money was amplified by the Foundation's long-standing role coordinating the Terrorist Sponsors' oil-for-weapons, services, and tunnels barter trades between Iranian entities and the Reconnaissance General Bureau ("RGB") of the Democratic Republic of North Korea ("DPRK" or "North Korea"), which began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars *per year* in bartered oil-for-weapons, services, and tunnels that the Terrorist Sponsors caused to flow through to were then supplied to Hizballah and the Qods Force and, through them (usually Hizballah), al-Qaeda and the Taliban, including its Haqqani Network, among others, to fuel their attacks.

### 2.     Islamic Revolutionary Guard Corps

30.     Since April 1979, the IRGC—also known as the "Sepah" and "Pasdaran," "Guards," and "Corps," and "Guardians"—has operated as a global terrorist organization.

31.     The IRGC's primary mission was—and is—to target the United States for terrorist violence. Since 1979, the IRGC regularly engaged in and supported terrorist attacks directed at the United States, seeking to coerce the U.S. government into changing U.S. policy, including by prompting America's exit from the Middle East and abandonment of its allies there, including Israel, and by deterring, degrading, and destroying U.S.-origin sanctions against Iran.

32.     When the IRGC targeted the United States, it used channels that were intended to obscure its role and thus supply plausible deniability for Iran. This was to prevent the IRGC's

terrorist violence from escalating into armed conflict between American and Iran. Accordingly, IRGC doctrine has focused on conducting attacks through proxies.

33.    The United States has long confirmed that the Iranian regime's lead operations arms were terrorist organizations that sponsored terrorist attacks. Hizballah was designated as a FTO in 1997, and the Qods Force was designated as a SDGT in 2007 and FTO in 2019.

34.    Since 2007, the IRGC was always a U.S.-designated terrorist organization. On October 25, 2007, the United States designated the Qods Force under E.O. 13224 for its support of terrorism, including its sponsorship of terrorist attacks by Hizballah and the Taliban. In so doing, the U.S. government confirmed that the Qods Force was "seeking to inflict casualties on U.S. … forces" and, *inter alia*, "had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support" and continued to do so, provided "support to the Taliban to support anti-U.S. … activity in Afghanistan," and provided key support to "Iraqi Shi'a militants who target and kill Coalition and Iraqi forces"—all of which efforts relied upon joint Qods Force-Hizballah training cells at which the "Qods Force operate[d] training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran." That same day the United States also designated every component of the IRGC for sanctions under E.O. 13382 for its proliferation-related activities.

35.    After 2007, the United States regularly imposed additional sanctions targeting the IRGC as part of its broader strategy to impose targeted sanctions against Iran-related actors to reduce the Iranian regime's ability to sponsor terrorist attacks targeting the United States.

36.    On July 1, 2010, President Obama signed the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, Pub. L. No. 111-195, 22 U.S.C. § 8501, *et seq.* It

provided, *inter alia*, that the United States must "persistently target Iran's Revolutionary Guard Corps and its affiliates with economic sanctions for its support for terrorism."

### 3.    Hizballah

37.    In 1982, the IRGC founded Hizballah by deploying the resources of the IRGC and the Foundation for the Oppressed to Lebanon. Ever since, Hizballah has served as the IRGC's most important terrorist partner. Hizballah's original name was selected by the same people who created the Foundation for the Oppressed on Earth; its Iranian creators called their newly created, and inextricably intertwined, Lebanese proxy the "Organization for the Oppressed on Earth."

38.    In 1985, the Organization for the Oppressed on Earth rebranded itself as "Hizballah" (Arabic for "Party of God") and published what it entitled an "Open Letter Addressed by Hizballah to the Oppressed in Lebanon and the World," which is commonly referred to as Hizballah's Manifesto. In it, Hizballah announced, among other things:

a.    "We, the sons of Hizballah's nation, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single, wise, and just command represented by the guardianship of the jurisprudent (*vali-e faqih*), currently embodied in the supreme Ayatollah … Khomeini. …"

b.    "[O]ur military apparatus is not separate from our overall social fabric."

c.    "[The] first root of vice is America. … Imam Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."

39.    Hizballah members swore their loyalty to Ayatollah Khomeini until his death, after which they swore their loyalty to Ayatollah Khamenei. During the period when Hizballah attacked or enabled the attack against each Plaintiff, every Hizballah operative worldwide was commanded by, and swore their oath to, Ayatollah Khamenei.

40.    Hizballah's geographic power base was in Lebanon, where it operated a parallel shadow government. However, Hizballah's activities stretched far beyond Lebanon's borders.

41.     Hizballah ordinarily functioned as a terrorist proxy for Iran, committing and orchestrating terrorist attacks abroad with Iran's support, including support from Ayatollah Khamenei, the Qods Force, and Supreme Leader's Office. Hizballah has trained and equipped local terrorist proxies to carry out terrorist attacks on its behalf—successfully employing this strategy to facilitate terrorist attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

42.     Hizballah, like its IRGC patrons, viewed attacks targeting Israel as inextricably connected to its efforts to target the *United States* to withdraw from the Middle East. Among other reasons, Hizballah believed that the United States controlled Israel, so the United States could be punished through attacks against its ally.

43.     The IRGC and the SLO provided most of Hizballah's budget and directly financed Hizballah attacks through a range of vehicles, including salary and bonus payments to Hizballah leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hizballah terrorists. The Iranian regime funded Hizballah's terrorism through an array of channels, including the SLO, IRGC (including Qods Force), Foundation for the Oppressed, and other fronts.

### 4.      Supreme Leader's Office

44.     Since 1989, Ayatollah Khamenei's official title has been "Supreme Leader of the Islamic Revolution," which reflected his—and the SLO's—transnational scope. Consistent with this approach, the SLO served as a multi-faceted operations, finance, and logistics front for Hizballah, the IRGC, and Khamenei's allies.

45.     Ayatollah Khamenei overhauled the SLO to optimize the Iranian regime's financial and logistical support for Hizballah-sponsored terrorist attacks. Consistent with this

overhaul, Khamenei also dramatically tightened his personal grip on the SLO and the other
Terrorist Sponsors—*i.e.*, the Foundation for the Oppressed, Hizballah, and the IRGC.

46.    To ensure control, Khamenei deployed SLO operatives (who were simultaneously
members of the IRGC) to serve as his representatives to Hizballah, the Foundation for the
Oppressed, and the IRGC, among others. Under Khamanei's control—exercised through his
IRGC terrorist son, Mojtaba Khamenei, the Ayatollah ordinarily operated the SLO to maximize
the amount of money spent on terrorism. Ayatollah Khamenei, Mojtaba Khamenei, and their
SLO agents embedded Khamenei's loyalists into every Iranian-regime-related organization of
consequence (government and business alike) to serve as eyes and ears for the Khameneis and
the SLO they jointly operated—including all components of the Foundation for the Oppressed,
IRGC, and Hizballah—through the Supreme Leader's "representatives."

47.    Khamenei was motivated by his desire to maximize the amount of funds and
support that the Iranian regime (most of all, the IRGC) supplied to the primary mission—export
the Islamic Revolution. Khamenei and his inner circle had a precise expectation: all or nearly all
the resources available to such terrorists and organizations should be allocated towards exporting
the Islamic Revolution unless the Supreme Leader said otherwise. While this did not mean that
100% of all Iranian money was to be spent on terrorism, it did mean that ***at least*** most such
IRGC resources would ordinarily be allocated to supporting violent terrorism targeting the
United States and its allies.

48.    Ayatollah Khamenei and his inner circle, most of whom were (and remain to this
day) in the Khamenei Cell, were a self-selected group who comprised the hardline end of the
range amongst even the hardliners—and so even the mere possibility that those under their
command were not devoting most of their resources to exporting the revolution was an

unacceptable possibility that had to be comprehensively eradicated. Given that Ayatollah Khamenei and his inner circle always prioritized defending and exporting the Islamic Revolution above all else, such outcome was patently unacceptable from their point of view and could never be allowed to happen again. Enter, Ayatollah Khamenei's newly and dramatically expanded the Supreme Leader's Office, through which Khamenei embedded his own hand-selected IRGC officers to serve the SLO as the Khamenei's eyes, ears—and guns—to eliminate any possibility that his volent vision—and the mathematical foundations and expectations upon which it was based—was being ignored, and to ensure that every IRGC component and terrorist maximally adhered to it.

49.    The Supreme Leader's Office was a Hizballah front. Among other reasons, Hizballah operatives worked under cover of SLO employment; Hizballah operatives used SLO facilities for their operations; and Hizballah benefitted from profits derived by the SLO, due to Hizballah's (including its leader, Hassan Nasrallah's) close relationship with Ayatollah Khamenei.

50.    The Supreme Leader's Office was also a Qods Force front. Among other reasons, Qods Force operatives worked under cover of SLO employment; Qods Force operatives used SLO facilities for their operations; and the Qods Force benefitted from profits derived by the SLO, due to the Qods Force's (including its leader Qasem Soleimani's) close relationship with Khamenei.

51.    To optimize its terrorist agenda, the SLO embedded agents throughout the IRGC, Hizballah, and the Foundation for the Oppressed, among others. The SLO relied upon notorious IRGC terrorists to personally support terrorist attacks sponsored by the IRGC and its proxies.

52.    Like the IRGC, the SLO depended upon the profits it generated from fronts it controlled to finance the IRGC and proxy terrorism.

53.    The SLO provided a financial slush fund for terrorist activities. Ayatollah Khamenei, Hizballah, the IRGC, and the Foundation for the Oppressed programmatically redeployed SLO resources, personnel, and profits to assist terrorist attacks by Iranian proxies. The SLO thus played a direct operational role in Hizballah- and IRGC-sponsored proxy attacks.

54.    From at least 2002 through 2005, and beyond, Ayatollah Khamenei, Hizballah, the IRGC, and the Foundation for the Oppressed programmatically redeployed SLO resources, personnel, and profits to assist terrorist attacks by Iranian proxies, including by routing SLO resources to support attacks in Afghanistan by al-Qaeda (routed through the Qods Force), in order to finance terrorist attacks in such places by such groups. At all relevant times, the SLO provided key resources to Hizballah and the Qods Force and, through them, to the attacks committed by Hizballah and proxies al-Qaeda and the Taliban. Throughout, the SLO played a direct operational role in Hizballah- and IRGC-sponsored proxy attacks and related decisions.

55.    As OFAC confirmed in designating the "Supreme Leader of Iran's Inner Circle" on November 4, 2019, "a shadow network of Ali Khamenei's military and foreign affairs advisors [] have for decades … exported terrorism, and advanced destabilizing policies around the world."

B.    **The Terrorist Sponsors Led the "Axis of Resistance" -- A Global Terrorist Alliance That Used Proxies to Commit Anti-American Terrorist Attacks**

56.    Since 1979, the Terrorist Sponsors have led an alliance of anti-American terrorist organizations, united by their shared mission of conducting terrorist attacks targeting the United States—directly, by targeting Americans, or indirectly, by targeting United States allies—to coerce U.S. government decisionmakers in Washington, D.C. and elsewhere into withdrawing

15

from the Middle East. Since 2003, this alliance has proudly called itself the "Axis of Resistance," and terrorist groups that comprised the Axis of Resistance acted as Iran's proxies for committing and facilitating terrorist attacks.

57.     For the attacks suffered by the plaintiffs in this case, Iran's relevant proxies in the Axis of Resistance included, among others: (1) Hizballah; (2) the Taliban (including its Haqqani Network); and (3) al-Qaeda (including its Military Council in Afghanistan/Pakistan). Each of these groups and its members was always an official, employee, or agent of Iran for purposes of committing terrorist attacks, and facilitating terrorist attacks was within the scope of their office, employment, or agency.

58.     The Axis of Resistance was not merely a slogan: it had nearly every jihadist function that would parallel a western alliance, including joint attacks—which the terrorists, U.S., U.N., and E.U. all called "operations"—that were committed through the work of joint cells in which two or more FTOs were co-located with one another for a common anti-American purpose, supported by joint training, procurement, financial support, logistics, basing, and intelligence. In Iran, for example, the regime maintained multiple complexes in which the IRGC, Qods Force, Hizballah, al-Qaeda, the Taliban, and others trained, studied, and plotted together as one coordinated syndicate of terrorists who worked together to target the United States and sought to coerce the U.S. government to withdraw from the Middle East.

59.     Axis members "resist" the U.S. presence in the Middle East. Part of this "resistance" included sponsoring waves of attacks against the United States and its allies, including Israel. But even attacks in Israel targeted the United States because the terrorists believed the former to be an agent of the latter and that America was key to whether they could

16

overthrow the Israeli government and replace it with their shared goal of an Islamic caliphate that governed Jerusalem, which they called "Qods."

60.     Each Plaintiff was injured in an attack that was funded by the IRGC, and committed, planned, or authorized by the Taliban (including its Haqqani Network) and al-Qaeda.

61.     Since the United States-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians working to rebuild Afghanistan and support its elected government. Iran provided material support for those attacks, which killed or injured Plaintiffs.

62.     Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for carrying out the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans. Indeed, the Taliban and al-Qaeda often participated in mafia-style meetings – attended by the leaders of several allied terrorist groups – in which they planned and authorized various terrorist attacks throughout Afghanistan. Given such coordination, former CIA official and senior White House advisor Bruce Riedel called the resulting terrorist superstructure within Afghanistan a "syndicate," composed of al-Qaeda, the Taliban (including its Haqqani Network) and several allied FTOs. In fact, bin Laden himself conceived of al-Qaeda as the leader of a broader coalition of terrorists drawing from other terrorist organizations in Pakistan and Afghanistan.

63.     Iran's support for multiple components of this "syndicate" ensured that its support had maximum effect. Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa. Iran recognized those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate. In doing so, Iran was able to achieve its intended effect: wide-ranging terrorist attacks against

Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and other components of the syndicate.

64.    Against that backdrop, Plaintiffs identify below the principal Afghan terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

### 1.    Al-Qaeda

65.    Osama bin Laden founded al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the United States. Iran has supported, supplied, and trained al-Qaeda terrorists since the 1990s, and since September 11, 2001, al-Qaeda has worked closely with Iran, through the Terrorist Sponsors, to launch attacks against the United States in Afghanistan, among other places.

66.    Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group with the capability of launching attacks around the world. After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered by the Taliban for the next five years. One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban reported that the initial meetings "emphasize[d] the Taliban's humble attitude toward [Osama bin Laden] and their immediate readiness to serve him." While under the Taliban's shelter, bin Laden declared war on the United States in a published *fatwa* (religious decree) in 1996.

67.    In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Omar personally and offered to lend his fighters to the Taliban in their battles with northern factions that were still resisting Taliban rule. As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, "The [Taliban]

movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan." Al-Qaeda supplied the strategy and support that the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans. During this time period, al-Qaeda also shared technical knowledge with the Taliban and reportedly paid the Taliban $10-20 million per year for shelter.

68.     At the same time that bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States. In 1998, while under the Taliban's protection, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.

69.     On August 7, 1998, al-Qaeda suicide bombers in explosives-laden trucks attacked the U.S. embassies in Kenya and Tanzania, killing more than 200 people and wounding more than 5,000 others. The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over bin Laden. He refused.

70.     As a result of these and other terrorist attacks, the U.S. Department of State designated al-Qaeda as a FTO on October 8, 1999. A week later the U.N. called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan. Again, the Taliban refused.

71.     In the spring of 2001, bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban. A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands. A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93. The United States demanded once again that the Taliban turn over bin Laden, and once

again the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

72.    Al-Qaeda also encouraged the Taliban to embrace new terrorist techniques. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. Taliban terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced them they were religiously permissible. Indeed, al-Qaeda trumpeted their ideological success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"  With al-Qaeda's encouragement and training, the number of such suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005 and more than 100 in 2006. Al-Qaeda further encouraged these attacks by paying the families of suicide bombers in Afghanistan.

73.    Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Bryan Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful [Al Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."

74.    Al-Qaeda operatives also served as embedded trainers with Taliban forces. These experienced trainers provided instructions, funding, and resources for conducting local and international attacks. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans. For example, al-Qaeda members trained Taliban commanders in bomb-making techniques. Al-Qaeda also invited Taliban commanders to Iraq, where they learned how to make armor-penetrating "shaped" charges, a type of IED later known

as an EFP. Taliban trainees also learned how to use remote controls and timers, and urban warfare tactics.

75.    Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates the planning and authorization activities of the al-Qaeda-Taliban syndicate. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was a "high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG"),] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003."

## 2.    The Taliban, including its Haqqani Network

### a.    The Taliban

76.    The Taliban is a Sunni Islamic terrorist organization. It was formed in 1994 and was composed mostly of former mujahedin fighters who had expelled the Soviet Union from Afghanistan. From its inception, the Taliban was a predominantly Pashtun movement led by Mullah Mohammed Omar. It began to overtake Afghanistan in late 1994, seeking to establish a radical Islamic government demanding strict adherence to Sharia law. The Taliban largely ruled Afghanistan from 1996 until 2001, although only three foreign countries formally recognized the Taliban government during that time.

77.    From 1996 until after September 11, 2001, the Taliban government harbored Osama bin Laden and al-Qaeda operatives in Afghanistan. In late 2001, in response to al-Qaeda's September 11 attacks on the United States and the Taliban's refusal to turn over Osama bin Laden, American-led Coalition forces invaded Afghanistan and quickly overthrew the

Taliban government. By November 2001, the Taliban had fled Kabul, and they abandoned Kandahar – their historical stronghold in southern Afghanistan – the following month. While rank-and-file Taliban terrorists dispersed back into the countryside, the Taliban leadership – including Mullah Omar – took refuge in Pakistan.

78.    In December 2001, the United Nations passed Resolution 1386 authorizing the International Security Assistance Force in Afghanistan, whose mandate was to maintain stability in Afghanistan and assist the Afghan government in rebuilding the country.

79.    In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mohammed Omar as SDGTs. This designation was necessary to guard against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."

80.    In May 2003, after the U.S. military toppled the Taliban-led government, the United States declared an end to major combat operations in Afghanistan. Afghanistan ratified a new Constitution in December 2003, and the Taliban was not invited to participate in the formation of a new government. The Taliban reacted by setting up "shadow" governments – including so-called "governors" – in most areas, seeking to exercise *de facto*, extra-legal control over the Afghan people.

81.    The Taliban's principal goal was to expel Coalition forces, particularly Americans, from the country and undermine the elected government of Afghanistan. To that end, the Taliban began to ramp up its terrorist attacks on U.S. forces in Afghanistan during the early-to-mid 2000s. The Taliban also started using new attack types, including suicide bombings. For example, the Taliban committed six suicide bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings more than doubled between 2005 and 2006.

82.     In 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act . . ., the Taliban shall be considered to be a terrorist organization." Consolidated Appropriations Act of 2008, § 691(d), Pub. L. No. 110-161, 121 Stat 1844 (2007).

83.     The Taliban often attacked American and Coalition forces, U.S. government contractors, and Afghan forces. But it has also targeted civilian aid workers, non-governmental organization workers, and Afghan civilians.

84.     The Taliban routinely violated the laws of war and did not comply with the Geneva Conventions. Among other violations, Taliban terrorists refused to wear uniforms or otherwise distinguish themselves from civilians; intentionally slaughtered civilians; used indiscriminate weapons; conscripted children into committing attacks; and engaged in widespread kidnapping and torture to intimidate their enemies.

85.     The Taliban – usually operating jointly with al-Qaeda – committed the terrorist attacks that killed or injured the Plaintiffs in this case.

86.     To effectuate those attacks, the Taliban employed several different attack types. Most prominently, the Taliban has relied heavily on Improvised Explosive Devices ("IEDs") designed to destroy American armored vehicles and inflict heavy casualties. Many of the Plaintiffs, or their family members, were killed or injured by Taliban-planted IEDs.

**b.     The Haqqani Network**

87.     The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is part of the Taliban.

88.     The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in

23

Haqqani-controlled territory. After September 11, 2001, the Haqqanis provided sanctuary to bin Laden when he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerilla war to reclaim our pure land from infidels" and "that Osama bin Laden is not only safe and sound, he is also in good spirits."

89.     The Haqqani Network's close relationships with other terrorist groups have helped spawn the modern terrorist syndicate operating in Afghanistan. Senior Haqqani Network officials have indicated that the Haqqani Network and al-Qaeda operate as one group. The Haqqani Network also maintains training camps and safehouses that are used by both al-Qaeda and Taliban operatives.

90.     Sirajuddin Haqqani has openly welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council.

91.     The U.S. Department of Treasury has repeatedly recognized the links between Haqqani Network leaders and al-Qaeda. For example, in 2010, it designated Nasiruddin Haqqani, the brother of Sirajuddin Haqqani, pursuant to E.O. 13224. That 2010 designation noted that Nasiruddin Haqqani had received funding via payments from al-Qaeda. And when the U.S. Department of Treasury designated Sirajuddin Haqqani's uncle, Khalil Al-Rahman Haqqani, as a SDGT in 2011, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations." The Haqqani Network itself was designated an FTO in 2012.

92.     The Haqqani Network began supplying weapons to the Taliban in the mid-1990s when the Taliban was in its infancy. It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban after the Taliban

captured Kabul. Jalaluddin Haqqani was the Minister of Tribal and Border Affairs in the Taliban government until the United States invaded Afghanistan.

93.    The Haqqani Network is especially active in the southeastern parts of Afghanistan, particularly the provinces of Paktia, Paktika, and Khost, collectively called Loya Paktia. It also developed a significant presence in the surrounding provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in these areas. The Haqqani Network leads the Taliban's Miramshah Shura – one of the four councils below the Taliban's leadership council – for Loya Paktia and provinces further north towards Kabul. The Taliban relies on the Haqqani Network to carry out the Taliban's operations within the Haqqani Network's sphere of influence, permitting the Taliban to present a united terrorist front throughout much of the country.

94.    The Taliban's terrorist commanders and shadow governors in the Loya Paktia area are often members of the Haqqani Network. As the U.S. Department of State explained when it announced the designation of Mullah Sangeen Zadran as an SDGT on August 16, 2011, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."

95.    The Haqqani Network's influence is not limited to the southeastern provinces. There is significant overlap between the broader leadership of the Taliban and the Haqqani Network.

96.    In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. Jalaluddin Haqqani planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In

October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army." Indeed, in an interview published by *Gulf News UAE* in 2001, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command" – akin to the Taliban army chief – and "Mullah Omar's top military strategist and commander." His son, Sirajuddin, oversaw al-Qaeda and Taliban terrorist operations throughout Afghanistan.

97.     The Haqqani Network also influenced Taliban strategic decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani Network also was involved in the rising number of Taliban insider attacks – attacks that strategically undermine relations between U.S. and Afghan forces. By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one dictating the new parameters of brutality associated with Taliban senior leadership" employing "[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."

98.     The Haqqani Network's influence within the broader Taliban is not limited to planning and authorizing attacks. Even outside of the Haqqani Network's traditional stronghold, its members often commit attacks along with other Taliban terrorists.

99.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban. The Taliban, for its part, has likewise rejected claims that the Haqqani Network is a separate entity from the Taliban.

100.    The Haqqani Network is often considered the Taliban's most radical part. Like the Taliban, it relies on terrorist attacks – including suicide, IED, insider, kidnapping, and

26

complex attacks – rather than open combat. Like the rest of the Taliban, the Haqqani Network routinely violates the laws of war and does not comply with the Geneva Conventions.

### 3. Al-Qaeda and the Taliban led a Syndicate of Groups in Afghanistan that Committed Anti-American Terrorist Attacks

101. Al-Qaeda and the Taliban (including the Haqqani Network), along with others, formed a mafia-style terrorist syndicate to jointly attack Americans in Afghanistan. This syndicate superstructure was publicly acknowledged by U.S. Special Envoy Zalmay Khalilzad on October 7, 2003, when he warned that Taliban and al-Qaeda may be planning "more spectacular attacks" to interfere with the reconstruction in Afghanistan. A January 22, 2004 Fact Sheet on Progress in the War on Terror stated that "the Taliban regime … turned the country into a training camp for al-Qaida." The lines between al-Qaeda, the Taliban, the Haqqani Network, and their terrorist allies were blurred, and these organizations worked together to attack Americans in Afghanistan.

102. Terrorism experts and scholars including Bruce Riedel, Bill Roggio, Thomas Joscelyn, and others similarly publicly commented that al-Qaeda and the Taliban (including its Haqqani Network) were closely intertwined as a terrorist syndicate that shared resources and collaborated to plan and commit terrorist attacks on Americans in Afghanistan.

103. Under the syndicate superstructure, providing support to al-Qaeda or the Taliban (including its Haqqani Network) was tantamount to aiding all these organizations because they planned and committed attacks together. Starting in the mid-2000s, as terrorism scholar Bill Roggio explained in 2009, public sources emphasized that "[t]he line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."

104. These groups also raised money together and shared resources. For instance, the Haqqani Network ordinarily managed the Taliban's transnational terrorist finance and logistics

operations and often aided al-Qaeda's as well. When doing so, the Haqqani Network used its network of agents, operatives, and fronts in the United Arab Emirates as an alias for its fellow syndicate terrorists. Treasury determined that the Haqqani Network regularly used its transnational terrorist finance activities to fund multiple al-Qaeda-affiliated syndicate members simultaneously. Accordingly, financial and other material support to any syndicate group assisted all of them.

105.    Because the syndicate organizations were operationally fused, many attacks committed by one syndicate organization (*e.g.*, the Taliban) were often either committed jointly with another organization, or were planned or authorized by that organization.

106.    Sources reveal that al-Qaeda and the Taliban (including its Haqqani Network) shared key leaders—for example, Sirajuddin Haqqani, who was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, its terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir). In addition to his attack planning role, Sirajuddin Haqqani played key roles in syndicate finance, and also in the manufacture of explosives for syndicate attacks. Public sources further reveal that al-Qaeda provided essential religious and logistical support to certain Taliban attack methods (especially suicide bombings, which the Taliban considered taboo before al Qaeda's influence changed its views, and the use of IEDs, which the Taliban learned from al-Qaeda). And they show that attacks on Americans were frequently planned at mafia-style meetings attended by al-Qaeda and Taliban (including Haqqani Network) terrorists.

107.    From at least 2001-2024, al-Qaeda and the Taliban conducted attacks targeting the United States in Afghanistan. Among other things, the terrorists targeted persons who had worked with, or for, the United States in Afghanistan to murder or kidnap such people as a means of intimidating people inside and outside of Afghanistan, including the U.S. government and persons in the United States.

### C.    The Terrorist Sponsors Used the Khamenei Cell to Coordinate Attacks

108.    Since the 1980s, the Terrorist Sponsors and their proxies, including al-Qaeda and the Taliban, have relied heavily on a "joint cell" model of violence, under which two or more terrorist groups combine one or more of their cells in a certain area, or for a certain competency, to optimize the lethality of their shared attacks. This joint-cell approach has enabled Iran's Terrorist Sponsors and Iran to maintain close control over their agents as they coordinated and executed terrorist attacks.

109.    U.S. government reports to Congress, publications, and studies also confirmed Hizballah's, the IRGC's, and their proxies' programmatic reliance on the joint cell model of terrorism. For example, DOD's official history of the U.S. Army's experiences in Iraq observed that the "Qods Force used members of Lebanese Hizballah, the Badr Corps, and, later, JAM to establish Iranian surrogate military cells throughout Iraq that could increase or reduce violent attacks against the coalition on order." An analysis released by U.S. government-published *Radio Farda* observed that the "Quds Force, led by Qassem Soleimani" served as a "'command' and headquarters for [IRGC] and Shia forces operating throughout the [Middle East] region" and was "[r]esponsible for dozens of terror attacks in the region and beyond."

110.     Hizballah and IRGC terrorists have regularly confirmed their joint cell approach. For example, as State reported to Congress in 2015, IRGC "General Amir Ali Hajizadeh … admitted that 'The IRGC and Hizballah are a single apparatus jointed together.'"

111.     The most significant joint cell was the "**Khamenei Cell**," which has existed since 2000 and was created and led by Ayatollah Khamenei to coordinate the deployment of operatives, weapons, logistics, pre-attack intelligence, and associated finances and fronts while seeking to obscure Iran's involvement in particular attacks. The Khamenei Cell was the operational outgrowth of Khamenei's decades-long operations-focused inner circle and included dozens of terrorist leaders who served Khamenei through their roles in the Foundation for the Oppressed, Hizballah, the IRGC, and SLO.

112.     The Khamenei Cell included Hizballah and IRGC operatives based in Iran, Iraq, and Lebanon, and was remarkably stable; every member was a terrorist leader who had sworn allegiance to the Supreme Leader, was a long-standing ally of Khamenei and part of his "inner circle" or a key lieutenant of such person, and had directly sponsored attacks targeting the United States. Some Khamenei Cell members were dual-hatted terrorists, meaning they were members of two allied groups.

113.     Hizballah played a lead role in committing, planning, and authorizing specific attacks sponsored by the Khamenei Cell. The Khamenei Cell thus functioned, in effect, as the Hizballah-led terrorist attack network that operationalized Ayatollah Khamenei's and the SLO's directives to execute the most complex attacks, which almost always meant high-profile rocket, missile, uncrewed aerial vehicle ("UAV"), bomb, and hostage-taking attacks targeting the United States. Khamenei and the SLO directed Hizballah-led attacks for decades through the personal involvement of Khamenei, the SLO, and senior members of Khamenei's inner circle.

114.    From 2000-2024, the Khamenei Cell and its members operationalized the Terrorist Sponsors' financing of attacks by Hizballah, the IRGC, al-Qaeda, and/or the Taliban (including its Haqqani Network) in Afghanistan, including the attacks against Plaintiffs and their loved ones. Such Khamenei Cell responsibilities including operating as a financial "aggregator" by serving as a centralized network that collected, invested, stored, laundered, and sent back to Hizballah, IRGC, and their Axis proxies' operations cells to enable Khamenei-sponsored, Hizballah-led, IRGC-supplied attacks targeting the United States in the Middle East.

115.    During this period, the Khamenei Cell had vast financial needs to sustain and intensify its sponsored attacks targeting the United States by Hizballah, the IRGC, al-Qaeda, and the Taliban.

116.    The Terrorist Sponsors also used Iran's support to access other non-dollar-based sources of finance that were even more potent than money: (1) the weapons that the Terrorist Sponsors usually gave to their Axis proxies, for which Iran supplied the inputs and capital needed for such weapons production; and (2) the Foundation for the Oppressed- and SLO-sourced "oil-for-weapons, training, and tunnels" barter deals with North Korea's terrorist arm, the RGB, on behalf of Axis proxies, that Iran financed by, for example, paying for shipping and port fees.

117.    The Khamenei Cell, and its members, allowed Ayatollah Khamenei to ensure that Khamenei-backed attacks by Hizballah, the IRGC, al-Qaeda, and the Taliban (including its Haqqani Network) received the full complement of logistics support such Axis proxy needed from every organ that Khamenei controlled.

118.    From 1989 through 2024, Ayatollah Khamenei was a direct sponsor of every component of the Khamenei Cell, including through his decades long, inner-circle, direct-access,

personal relationships with the leaders and key leadership cell members of every terrorist organization Khamenei sponsored through any entity he controlled, including the persons identified above.

119.    The Khamenei Cell played a direct role in every attack against Plaintiffs, which typically featured multiple separate touchpoints with the Khamenei Cell.

## II.    The Terrorist Sponsors Enabled Iran to Provide Vital Support to Attacks

120.    Throughout the relevant period, the Terrorist Sponsors used several mechanisms to ensure that more than half of the Terrorist Sponsors' profits flowed systematically and ineluctably to fund proxy attacks.

121.    **Logistics Policy Directive.** One such channel was the Iranian government's Logistics Policy Directive, an official policy dictating that the IRGC must dedicate the profits earned from its commercial activities to terrorist attacks. Published on June 8, 2003 in Iran's Official Gazette, the Directive provided that the profits derived from whenever "any unit" of "the Islamic Revolutionary Guard Corps … and related organizations … sign[ed] contract agreements for civil projects…shall be deposited to the Chancery, and its equivalent shall be placed at authority of the [IRGC] from the credit determined in the annual budget, so that it would be used for the costs related to the [IRGC-related] contract, also the strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for its operations, *i.e.*, terrorism. Moreover, under the Directive, the IRGC "can, proportionally to [the IRGC's] needs, exchange or sell excess material, and equipment and machinery" to finance IRGC operations.

122.    At bottom, the Logistics Policy Directive established an ironclad rule: the IRGC was authorized and encouraged to engage in commercial activity through its fronts, subject to the requirement that the IRGC use any profit to fund the IRGC's central anti-American terrorist

32

mission. The Directive, in effect, mandated that profits from IRGC fronts be used primarily to enable IRGC-sponsored terrorism by providing off-the-books funding sources for key IRGC weapons programs and other forms of support for terrorist attacks. Since 2003, the Directive has always been in force, has always applied to profits generated by the IRGC's front companies, and has always required that such profits be dedicated to sponsoring acts of terrorism. The Directive has meant that the IRGC earmarked the profits its fronts generated to directly fund terrorist attacks.

123.    **Mandatory Donations (*Khums*).** From 1979 through the present, the Terrorist Sponsors have relied upon mandatory donations, or *khums*, comprising 20% of all income, which has flowed up to Khamenei and then back down to the Khamenei Cell and, through the Khamenei Cell, to Iran's proxies to finance terrorist attacks. Shiite theological traditions call for donations (*khums*), usually equal to 20% of a person's income on every transaction, to support the cause. Pursuant to governing IRGC and Hizballah doctrine, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions—without exception—including, but not limited to, profits generated through official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The IRGC's "no exceptions" rule ensures that the terrorists have an administratively simple scheme analogous to a terrorist-funding flat tax.

124.    **Terrorist Sponsor Fronts.** Beyond those mandatory mechanisms, the Terrorist Sponsors have used additional profits generated by commercial fronts, directly or indirectly operated for their benefit, to fund attacks. The Foundation for the Oppressed, for example, has directly financed terrorist attacks by Iran's proxies because that has always been the Foundation's primary reason for existence. The same was true of the SLO and IRGC. The

Terrorist Sponsors have exercised programmatic control over their respective profits generated by their stake in fronts, which the Terrorist Sponsors have used to maximize their ability to convert such value into attacks targeting Americans and the United States. As *Radio Free Europe* confirmed in 2009, "all the IRGC's economic activities are monitored only by internal IRGC auditors." A legion of in-house Hizballah, IRGC, and SLO auditors and accountants have ensured that the terrorists had an ironclad grip over the funds they generated—and that Khamenei could direct it to attacks.

125.    In at least three different ways explained below, the Terrorist Sponsors have used the money flowing to them to provide vital support for Iran's terrorist proxies in Afghanistan.

126.    *First*, throughout the relevant period, Iran trained Hizballah and used Hizballah to train its other proxies, including syndicate member al-Qaeda, among others. The Terrorist Sponsors supplied (and/or paid for) attack-related training, including, but not limited to, in IRGC, Hizballah, and RGB training camps located in, *inter alia*, Iran, Iraq, Lebanon, Syria, and North Korea. Such training was rigorous and multi-month, among other features.

127.    North Korean training has strengthened the IRGC's and Hizballah's terrorist tactics, techniques, and procedures (or "TTP") since the early 1980s, and directly flowed to their proxies through the IRGC and Hizballah. North Korea has provided extensive terrorist TTP—materials, training courses, and trainers—to the IRGC and Hizballah since the early 1980s. This has included IRGC/Hizballah training (based on DPRK training); IRGC-funded North Korean trainers deployed in Iran, Lebanon, and Syria; and IRGC-funded IRGC and Hizballah training by North Koreans in the DPRK.

128.    *Second*, the Terrorist Sponsors have used resources and technologies from the Terrorist Sponsors' commercial activities to design, build, transport, supply, and maintain the

arms and weapons systems required for, *inter alia*, missile, rocket, mortar, UAV, rocket-propelled grenade ("RPG"), and small arms attacks, among others. The Terrorist Sponsors have supplied these arms to the Taliban, among others, to power their attacks in Afghanistan.

129.    *Third*, as explained in Part III, Iran provided significant financial support to the Taliban, including regular cash payments and direct monetary incentives for attacks against Coalition forces and Afghan officials. This funding included both large lump-sum transfers and a structured payment system that rewarded violence against specific targets, demonstrating Iran's strategic efforts to undermine Coalition operations in Afghanistan by financing terrorist activities.

## III.    The Terrorist Sponsors Gave Unique and Lethal Aid to the Taliban and al-Qaeda

130.    Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, Hizballah, and SLO supported al-Qaeda and the Taliban, including its Haqqani Network. These terrorist organizations jointly planned and executed attacks on Americans in Afghanistan throughout at least the period from 2002-2005. They shared the Terrorist Sponsors' goal of expelling the United States from the region, and the Terrorist Sponsors provided these organizations with support—including funds, weapons, training, technology, and logistical assistance—to advance this common cause. Al-Qaeda and the Taliban (including its Haqqani Network) thus acted as proxies for the Terrorist Sponsors in Afghanistan.

131.    The IRGC notoriously provided robust support to al-Qaeda and the Taliban, including its Haqqani Network, for the specific purpose of supporting those entities' attacks on American forces in Afghanistan. The support included funds, weapons, training, logistical assistance, and safe haven, all of which enabled terrorist attacks on Americans.

132.    As alleged above, the mafia-style "syndicate" of which both the Taliban and al-Qaeda formed a part made attacks by each group more lethal. Iran's mutually reinforcing support for both the Taliban and al-Qaeda made both organizations more effective.

133.    By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families. Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members. Moreover, al-Qaeda was closely intertwined with the Taliban and associated terrorist groups acting in Afghanistan, and al-Qaeda planned and authorized the Taliban attacks in which it did not directly participate. Material support and resources provided to al-Qaeda thus flowed to the Taliban, causing the injury and deaths of Plaintiffs or their family members.

134.    Iran assisted al-Qaeda and Taliban (including Haqqani Network) attacks targeting the United States in Afghanistan, including against Plaintiffs, by flowing profits to the Foundation for the Oppressed.

### A.    Al-Qaeda

135.    From at least 2002-2005, and beyond, Iran, through its Terrorist Sponsors, provided material support for terrorist attacks by al-Qaeda targeting the United States.

136.    Iran—particularly the IRGC and its Qods Force—has supported, supplied, and trained al-Qaeda terrorists since the 1990s. Throughout, al-Qaeda has played a significant role in Iran's regional and global campaign of supporting terrorism to further the IRGC's goals, including damaging, weakening, and destroying the United States and Israel. As the *Washington Post* reported in 2002—in an article titled "Terror Alliance Has U.S. Worried; Hezbollah, Al Qaeda Seen Joining Forces"—the "collaboration" between Iran (through Hezbollah) and al-Qaeda "illustrate[d] what analysts" said was "an evolving pattern of decentralized alliances

between terrorist groups and cells that share[d] enough of the same goals to find common ground: crippling the United States, and forcing the U.S. military out of the Middle East and Israel out of Palestinian territory." The article quoted Steven Simon, a former National Security Council terrorism expert, as saying, "There's a convergence of objectives."

137.    Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, Hizballah, and SLO have long aided attacks committed by al-Qaeda (including al-Qaeda's branches) that targeted the United States in the Middle East, Africa, and the United States. The sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership never hindered cooperation between the Terrorist Sponsors and al-Qaeda. Whatever their religious differences, they shared a hatred of America and supported anti-American violence.

138.    The Terrorist Sponsors have supported al-Qaeda's terrorist activities for decades, since at least the early 1990s, when bin Laden lived in Sudan.

139.    Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, Hizballah, and SLO supported al-Qaeda attacks targeting the United States worldwide from the early 1990s through 2024. Throughout, the Terrorist Sponsors shared al-Qaeda's goal of driving the United States out of the Greater Middle East and supplied al-Qaeda with material support—including funds, weapons, training, technology, and logistical assistance—to advance this common cause. Al-Qaeda thus acted as a proxy for the Terrorist Sponsors globally.

140.    Iran has supported al-Qaeda's terrorist activities since the early 1990s. Iran, through the IRGC and Hizballah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general attack tactics directed at American interests. For example, in *Owens v. Republic of Sudan*, a court in this District found that senior al-Qaeda operatives traveled to Iran and Lebanon during this

period to train in camps run by Hizballah and sponsored by the Qods Force, and found that "[p]rior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings." 826 F. Supp. 2d 128, 138 (D.D.C. 2011). The *Owens* court found that operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa. *Id.*

141.    Indeed, as Ofira Seliktar and Farhad Rezaei explained in Iran, Revolution, and Proxy Wars (2021) on June 25, 1996, "a massive explosion destroyed the Khobar Towers in Dhahran, near the headquarters of Aramco housing a US Air Force unit. … The United States declared Hezbollah al Hijaz responsible, but, in reality, the operation was carried out by Al-Qaeda with the guidance and support of the IRGC-QF, MOIS, and the Lebanese Hezbollah. … Ayatollah Khamenei allegedly approved the mission, and senior Quds Force officials gathered … to follow the outcome."

142.    Moreover, when the United States indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States." And the *Owens* court found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations. 826 F. Supp. 2d at 151. President Trump also confirmed in 2017 that "Iranian proxies provided training to operatives who were later involved in al Qaeda's bombing of the American embassies in Kenya[] and Tanzania."

143.    After 9/11, Iran provided safe harbor to many senior leaders of al-Qaeda and their families, including bin Laden's sons. As *Owens* found, Iran permitted these senior leaders to

move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world. 826 F. Supp. 2d at 137-38. Per *Owens*, Iran effectively provided al-Qaeda with a safe location to orchestrate its attacks: "When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse.'" 826 F. Supp. 2d at 150-51. This was confirmed by President Trump in 2017: "The [Iranian] regime harbored high-level terrorists in the wake of the 9/11 attacks, including Osama bin Laden's son. In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel."

144.    In June 2004, *Newsweek*'s renowned investigative journalists Michael Isikoff and Mark Hosenball confirmed that "[w]hile the link to Iran has been publicly known for some time, the 9/11 commission has uncovered evidence that in the mid-1990s Osama bin Laden cast aside religious differences with the Iranians and arranged to have his terror operatives conduct training in explosives and security at Iranian-backed camps run by Hizbullah in Lebanon."

145.    After 9/11, senior al-Qaeda leadership, sheltering in Iran under the patronage of and with the counsel of IRGC operatives, modeled their post-9/11 organization and tactics on Hizballah and the Qods Force.

146.    Iran has maintained a decades-long travel assistance relationship with al-Qaeda as part of the terrorist alliance between Iran, al-Qaeda, and Lebanese Hizballah. A 2020 Report from the Combating Terrorism Center at West Point confirmed that "[m]uch of Iran's involvement in the region is directed toward and in Afghanistan. … Brigadier General Esmail Qaani[] has about two decades of experience overseeing the IRGC-QF's operations in Afghanistan. … [t]he Islamic Republic's involvement in Afghanistan dates to the 1980s."

147.    Iran's service as the "terrorist land bridge" by its provision of travel assistance to al-Qaeda was essential to the terrorists' ability to attack Americans throughout the Greater Middle East. Indeed, in December 2011, the Honorable George B. Daniels of the United States District Court for the Southern District of New York issued a detailed opinion setting forth findings of fact concerning the Terrorist Sponsors' and Iranian regime's decades-long history with al-Qaeda in a 9/11-related case against Iran, including finding that:

> Perhaps the most important form of aid Iran gave al Qaeda prior to 9/11 (and continues to give today) involves the facilitation of travel. … Travel assistance "is invaluable," not only to avoid detection and arrest, but established lines of transit make recruitment and training easier, as individuals can travel to and from training camps without fear of interference. Also, travel facilitation enables better communication and coordination. Even before 9/11, al Qaeda was aware that the United States monitored phones and other forms of communication and recognized that many sensitive deliberations are best done face-to-face. Doing so requires individuals who can travel freely from one area to another.

*In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *28 (S.D.N.Y. Dec. 22, 2011).

148.    The list of al-Qaeda-affiliated terrorists who supported al-Qaeda attacks against Americans from their post 9/11 Iranian safe-haven reads like an al-Qaeda management roster, featuring nearly two dozen senior leaders, organizers, planners, ideologues, and terrorist operatives from around the world—comprising most of al-Qaeda's military council from 9/11 through 2015. The following terrorists all sheltered at the Qods Force facility in Tehran, and all were witnessed by a person who visited the facility on or about 2007:

a.    **Osama bin Laden's family**, including sons Saad, Mohammad, Othman, Ladin, and Hamza (one of whom even got married in Iran), wife Najwa, and daughter Iman;

**Abu Muhammad al-Masri**, al-Qaeda's chief of foreign relations and a senior member of al-Qaeda's military council who eventually became al-Qaeda's second-in-command overall, behind only Ayman al-Zawahiri, after bin Laden was killed in 2011, and who managed al-Qaeda operations from his safe haven in Iran from 9/11 until he was killed in Tehran by Mossad agents on August 7, 2020;

**Saif al-Adel**, al-Qaeda's military chief and overall third-in-command, who, among other things, was tasked with facilitating al-Qaeda's support for the Sunni insurgency against

40

Americans in Iraq from Iran, and directed anti-American attacks from Iran under the wing of the Qods Force;

b.  **Abu Musab al-Suri**, a senior al-Qaeda strategist who was one of the most important thinkers for the group;

c.  **Mahfouz Ibn El Waleed**, a key member of al-Qaeda's leadership council and its sharia committee, who helped approve and justify attacks against America from his safe haven in Iran;

d.  **Abu Dagana al-Alemani**, a senior al-Qaeda attack planner who coordinated al-Qaeda's logistical support for its global affiliates from Iran; and

e.  **Sulaiman Abu Ghaith**, who served as al-Qaeda's spokesman from Iran and helped rally support for al-Qaeda's anti-American jihad from there.

149.    Among the senior al-Qaeda leaders who fled to Iran after 9/11, most remained ensconced in Iran thereafter, never leaving their Iranian safe-haven while continuing to support the jihad against America.

150.    Iran's safe haven support for al-Qaeda did not diminish after 9/11. For example, in 2011, Judge Daniels found that "[s]ince the 9/11 attacks, and continuing to the present day, Iran continues to provide material support and resources to al Qaeda in the form of safe haven for al Qaeda leadership and rank-and-file al Qaeda members." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *41.

151.    As the *Washington Post* reported in 2020 after al-Qaeda's second-in-command, Masri, was killed in Tehran in 2020, "[m]any of al-Qaeda's senior commanders have been sheltered in Iran, though one by one, they have been killed in recent years. With Masri's death, the only remaining member of al-Qaeda's shura council — its core leadership — with operational al-Qaeda terrorist experience is Saif al-Adel, who is believed still to be in Iran."

152.    Iran's assistance also extended to permitting al-Qaeda and its affiliates to use Iran as a safe-haven from which to plan and prepare attacks against Americans. As Judge Daniels

found, after 9/11, "[t]here have been numerous instances of al Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al Qaeda members continued to conduct terrorist operations from inside Iran." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *25.

153.    In August 2003, Iran facilitated a meeting in Tehran between lieutenants from al-Qaeda's Iraq branch, al-Qaeda-in-Iraq, in which the participants agreed to establish a permanent terrorist base in Kurdistan to facilitate attacks against Americans and ensure the smooth functioning of the pipeline between the Arab world and Afghanistan, which ran through Iran and was essential to Sunni terrorists' supply of weapons, funds, and personnel.

154.    At this time, al-Qaeda depended upon the assistance of the Qods Force to maintain al-Qaeda's Iran pipeline, through which the group moved funds and personnel between the Middle East and its home base in Pakistan.

155.    Like its transportation assistance to al-Qaeda, Iran has also maintained a decades-long training relationship with al-Qaeda as part of the terrorist alliance between Iran, al-Qaeda, and Lebanese Hizballah.

156.    Iran, through the IRGC and Hizballah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general tactics for attacks directed at American interests. For example, the *Owens* court found that senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by Hizballah and sponsored by the Qods Force. The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa. *See Owens*, 826 F. Supp. 2d at 151. According to one senior al-Qaeda official, trainers at

this time were already researching how to develop shaped charges to pierce armor plating – the technology later perfected in Iranian EFPs.

157.    As Judge Daniels found, "[t]hroughout the 1990s, the al Qaeda–Iran–Hizballah terrorist training arrangement continued. Imad Mughniyah himself coordinated these training activities, including training of al Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon. At all times, Iran's Supreme Leader was fully aware that Hizballah was training such foreign terrorists." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *12. Indeed, Judge Daniels also concluded:

a.    "The well-known historical religious division between Sunnis and Shi'a did not, in fact, pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001."

b.    "In 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."

c.    "Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."

d.    "In 1993, in a meeting in Khartoum, Sudan, arranged by Ah Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a multipurpose member of the Iranian terrorist structure."

e.    "At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism."

f.    "Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda." "[I]t was Mughniyah who made bin Laden into an accomplished terrorist."

g.    "Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security."

"The creation of the Iran–Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies," leading to the first World Trade Center attack in 1993, the Khobar Towers bombing in 1996, the African embassy bombings in 1998, the USS Cole attack in 2000, and 9/11.

*In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *11-12 (internal citations and

quotations omitted).

158.    The Terrorist Sponsors caused al-Qaeda to embrace suicide bombing as a tactic.

Hizballah and Qods Force operatives acting at Ayatollah Khamenei's direction originally

instructed al-Qaeda in the theological, technological, and tactical aspects of suicide bombing as a

strategy based upon Iran's and Hizballah's own experience successfully using suicide bombers.

159.    While al-Qaeda was re-building itself in Iran after 9/11, the Iranians rejected

requests from the U.S. and its allies to stop aiding al-Qaeda. For example, in 2003, then-U.S.

ambassador to Iraq, Ryan Crocker, implored Iranian officials to cease their support for al-

Qaeda's terrorism—a request the Iranians refused. By then, Iran was already sheltering and

supporting al-Qaeda's military leader, Saif al-Adel, in his IRGC-QF-provided Tehran safe house.

Looking back at this time, Secretary of State Pompeo noted on January 12, 2021:

> We had al-Qaida on the ropes after 9/11. … That effort drove al-Qaida to search for a safer haven, and they found one. The Islamic Republic of Iran was the perfect choice. … al-Qaida has, in fact, carried on a relationship with Tehran for nearly three decades, as the 9/11 Commission clearly established. In the early '90s, al-Qaida operatives traveled to Iran and the Bekaa Valley of Lebanon – the heartland of Hizballah – for explosives training. … [A]fter 9/11, hundreds of al-Qaida terrorists and their families fleeing America's righteous vengeance took refuge there inside of Iran. … Thirty years of cooperation shows that Iran and al-Qaida's divergent theology is no match for its convergent hatred.

160.    Iran was thus the proximate and but-for cause of al-Qaeda's survival as a terrorist

organization after 9/11. Osama bin Laden personally concluded that al-Qaeda would have

collapsed after 2001 without Iran's key support. For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets and, in a secret internal al-Qaeda communique, explained that Iran was al-Qaeda's "***main artery for funds, personnel, and communication***" and vital to the terrorist group's survival post-9/11. This quote was confirmed by Secretary of State Pompeo on January 12, 2021: "These are bin Laden's own words about his and al-Qa'ida's relationship with the Islamic Republic of Iran."

161.    U.S. officials also confirmed Iran's provision of safe haven and other support to al-Qaeda in 2002, as reported by *UPI Insight Magazine* that year. According to *UPI*, "Iran continues to provide a western haven for al-Qaeda terrorists fleeing Afghanistan" and "the back door that Iran is providing for Islamic terrorists seems untouchable." As *UPI* reported, the Bush administration has publicly condemned Iran for sheltering what they described as "dozens" of al-Qaeda members reportedly staying along the Afghan border. An Afghan intelligence officer named Idris provided more concerning information to Insight, explaining that the movement of terrorists was bidirectional. According to this intelligence official, "[f]ollowing the Sept. 11 terrorist attacks, some 20 or 30 al-Qaeda Arabs entered Afghanistan via Iran during the months of October and November 2001." Idris further reported that "these cross-border movements are protected by Iranian military units operating in areas of western Afghanistan where U.S. and other multinational forces have yet to venture."

162.    Iran's support for al-Qaeda and the Taliban, included significant weapons assistance in Afghanistan as well. According to *UPI Insight Magazine*, "ISAF [The International Security Assistance Force] may have encountered a battalion of the Revolutionary Guard's elite … special forces … in the western Afghan province of Takhar." "Aghan defense officials" reported that these Iranian forces were distributing "'large stores of arms and ammunition' … 'to

friendly commanders.'" According to the report, a "U.S. special-forces officer report[ed] that brand-new Iranian-made AKS-74 automatic rifles" were "flooding Afghanistan." Intelligence reports indicated "three Iranian Revolutionary Guard officers were killed last year in U.S. air strikes … in the western Afghan province of Herat, which is now ruled by Iran's close ally, Ismail Khan." With Iranian military advisors, Khan reportedly planned to establish a "Western Federation" that might challenge Kabul's authority. Despite religious differences between Shia Iran and the Sunni Taliban, bin Laden, through al-Qaeda, focused on a "strategy of uniting diverse strains of Islam into a universally anti-American pan-Islamic movement." The article also noted that "Northern Alliance officers identif[ied] two terrorist instructors at al-Qaeda's Shomali camp, one of the main terrorist bases in Afghanistan, as Iranians who previously had trained Hezbollah guerrillas at a military compound near Iran's religious capital of Qom. Training videos and documents uncovered at the abandoned terrorist base located north of Kabul, aired by CBS in a *60 Minutes* documentary, included plans to take over U.S. embassies and assassinate Western heads of state."

163.    U.S. officials have recognized the connections between Iran and al-Qaeda. In March 2002, the *Philadelphia Inquirer* reported that "[a] U.S. military official confirmed … that an Iranian group was being held and interviewed at Kandahar's airport, an American base where scores of suspected members of the al-Qaeda organization and the Afghan Taliban are also detained, the *New York Times* reported. There was no immediate public reaction from the Iranian government to the detention. American officials have complained repeatedly that Iran was working in western Afghanistan to undermine the new U.S. influence in this country."

164.    In 2005, the U.N. Security Council confirmed the importance of stopping the flow of funds to al-Qaeda and the Taliban, reporting as follows: "Despite the difficulty of quantifying

its effect, the Team is convinced that the sanctions regime is an essential element of the international effort against Al-Qaida, the Taliban and their associates. As most terrorist acts cost little and may require few operatives or arms, stopping even a small amount of money or any travel or arms sales may save lives. In addition, the sanctions serve to create a hostile environment for terrorists, and if they are deterred from attempting a wire transfer, a border crossing or an arms purchase, then the sanctions have fulfilled their purpose."

165.    The United States has also recognized these connections. On July 28, 2011, Treasury designated as SDGTs six members of al-Qaeda operating in Iran under a secret agreement between Iran and al-Qaeda. The agreement provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan." Treasury found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia." Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shi'a Muslims elsewhere in the Middle East.

166.    The United States has repeatedly recognized al-Qaeda's close operational partnership with the Iranian regime in making SDGT designations under Executive Order 13224. In 2012, Treasury designated Khamenei agents and allies in Iran's Ministry of Intelligence and Security (or "MOIS") as a terrorist-sponsoring entity for supporting al-Qaeda. In 2014, Treasury

likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."

167.    When the Terrorist Sponsors aided al-Qaeda's attacks in Afghanistan, among other places, the modalities of the Terrorist Sponsors' support was substantially similar: logistical assistance, including passports, ratlines, and—most importantly—communications systems, as to which the Terrorist Sponsors reliably served as a large-scale supplier of mobile phones and encrypted communications technologies that enabled al-Qaeda's management in Iran to securely communicate with, and direct, al-Qaeda's branches in, *inter alia*, Afghanistan.

168.    Khamenei Cell members in Iran and Lebanon, among other places, supplied key aid to attacks by al-Qaeda against Plaintiffs. Such members included, but were not limited to:

a.    **Hassan Nasrallah** was a member of the Khamenei Cell and used funds routed to him through the Terrorist Sponsors and Khamenei Cell to sponsor of attacks in Afghanistan by al-Qaeda (inclusive of its branches and members), for which he supplied key funds, logistical aid (including vital communications-related support), and intelligence support. Nasrallah had extensive, decades-long, al-Qaeda-specific experience. Nasrallah ensured that al-Qaeda's alliance with Iran's lead terrorist proxy, Hizballah, always continued and proved the intelligence operatives on the ground had been right all along.

b.    **Qasem Soleimani** was a member of the Khamenei Cell and used funds routed to him through the Terrorist Sponsors and the Khamenei Cell to sponsor attacks in Afghanistan by al-Qaeda (inclusive of its branches and members), for which he supplied key funds, logistical aid (including vital communications-related support), and intelligence support. U.S. government findings confirmed it. Such aid comported with decades of conduct by Soleimani and al-Qaeda alike. Soleimani was always a key sponsor of attacks by al-Qaeda, including its branches in Kenya (where Soleimani helped commit the 1998 U.S. Embassy bombing) and Afghanistan (where Soleimani deployed in formative years of his career). In every location, Soleimani personally coordinated with al-Qaeda leadership (global and in-country) to coordinate the Terrorist Sponsors' support for al-Qaeda directed violence targeting the United States from the relevant geography. For all the above support, Soleimani supplied funds, intelligence support, and logistics—for attacks by al-Qaeda's branches in, among other places, Afghanistan, and reliably coordinate pre-attack finances, attack plans, and logistics. Indeed, Soleimani admitted his vital role propagating attacks in Afghanistan in his infamous letter to General Petraeus.

c.    **Esmail Qaani** was a member of the Khamenei Cell and used funds routed to him through the Terrorist Sponsors and the Khamenei Cell to sponsor attacks in Afghanistan by al-

Qaeda (inclusive of its branches and members), for which he supplied key funds, logistical aid (including vital communications-related support), and intelligence support. Qaani had extensive, decades-long, Afghanistan-specific experience. Accordingly, Qaani's Afghanistan facing role was always dominant both before and after Soleimani's death in 2020.

169.    The Terrorist Sponsors' alliance with al-Qaeda and direct support for al-Qaeda sponsored attacked committed in Afghanistan, among other places, endured at least throughout the period from 2002 through 2005, and beyond, including when al-Qaeda coordinated the attacks that killed and injured Plaintiffs or their loved ones.

### B.    The Taliban (Including its Haqqani Network)

170.    From at least 2002-2005, and beyond, Iran, through its Terrorist Sponsors, provided material support for terrorist attacks by the Taliban targeting the United States.

171.    Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban. Many of the weapons Iran provided were designed to be particularly effective against U.S. and allied forces operating in Afghanistan. For example, Iran provided the Taliban with anti-tank mines, long range rockets, explosively formed penetrators, suicide vehicle-borne improvised explosive devices, RPGs, and explosives, all of which were uniquely suited for terrorist attacks on U.S. and allied forces.

172.    Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice and/or assistance, safe harbor, and transportation. Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces. Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

173.    U.S. Defense officials publicly acknowledged Iranian support for the Taliban and al-Qaeda, as was reported by *Al Bawaba News* in February 2002:

> US Defense Secretary Donald Rumsfeld said there "isn't any doubt" that Tehran helped al-Qaeda and Taliban fighters escape from Afghanistan into neighboring Iran. "There isn't any doubt in my mind but that the porous border between Iran and Afghanistan has been used for al-Qaeda and Taliban to move into Iran and find refuge," Rumsfeld told ABC television. "We have any number of reports that Iran has been permissive and allowed transit through their country of al-Qaeda," he added. The US newsweekly Time, in its issue due out Monday, echoed the report, saying that some 250 senior Taliban and al-Qaeda members were believed to have crossed the border into Iran via a smugglers' route just before the Taliban's Herat contingent fled in November. "The Iranian Revolutionary Guard has an eye on everything that happens along the border," a Western diplomat in Afghanistan told the magazine on condition of anonymity. "Of course they know that Taliban and al-Qaeda fighters are getting across." According to AFP, Rumsfeld conveyed he had indications that groups in Afghanistan were receiving weapons from Iran: "We have any number of reports more recently that they have been supplying arms in Afghanistan to various elements in the country," he said. President George W. Bush earlier this week dubbed Iran, Iraq and North Korea an "axis of evil" and threatened reprisals against Tehran for seeking weapons of mass destruction. … In his State of the Union address on Tuesday, the US President labelled Iran, Iraq and North Korea as an 'axis of evil' … [and] Bush also accused the Islamic Republic of trying to destabilize neighboring Afghanistan.

174.    Iran also facilitated the Taliban's attacks by allowing the Taliban to establish offices in Iran to serve as bases for planning terrorist attacks. For example, Iran permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with Afghanistan and Pakistan.

175.    Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces. The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

176.    Iran has also supported the Taliban financially. On an annual basis, Iran provided large cash payments to the Taliban. For example, a purported February 2005 military intelligence

summary (as published by the *Guardian* in 2010) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.

177.    Iran also directly paid Taliban insurgents to kill U.S. forces. Another purported February 2005 military intelligence summary (as published by the *Guardian* in 2010) reported on a Taliban group that Iran was paying $1,740 for each Afghanistan soldier killed and $3,481 for each Government of Afghanistan official killed. The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful. Iran paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle.

## IV.    Plaintiffs Were Killed Or Injured In Extrajudicial Killings or Hostage Takings By Iranian Terrorist Proxies for which Iran Supplied Material Support

### A.    The March 4, 2002 Small Arms Attack in Paktia (Commons Family)

178.    On March 4, 2002, the Taliban (including its Haqqani Network) committed a small arms attack in Paktia Province, Afghanistan (the "March 4, 2002 Attack"). The March 4, 2002 Attack constituted an extrajudicial killing.

179.    Corporal Matthew Commons served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Commons was injured in the March 4, 2002 Attack. CPL Commons died on March 4, 2002, as a result of injuries sustained during the attack.

180.    CPL Commons was a U.S. national at the time of the attack and his death.

181.    Plaintiff Gregory Commons is the father of CPL Commons and a U.S. national.

182.    Plaintiff Aaron Commons is the brother of CPL Commons and a U.S. national.

183.    Plaintiff Mae Commons is the sister of CPL Commons and a U.S. national.

184.    Plaintiff Linda Chapman is the stepmother of CPL Commons and a U.S. national. Ms. Chapman lived in the same household as CPL Commons for a substantial period of time and considered CPL Commons the functional equivalent of a biological son.

185.    As a result of the March 4, 2002 Attack and CPL Commons's injuries and death, each member of the Commons Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Commons's society, companionship, and counsel.

186.    As a result of the March 4, 2002 Attack, CPL Commons was injured in his person and/or property. The Plaintiff members of the Commons Family are the survivors and/or heirs of CPL Commons and are entitled to recover for the damages CPL Commons sustained.

**B.    The May 19, 2002 Small Arms Attack in Paktika (Vance Family)**

187.    On May 19, 2002, the Taliban (including its Haqqani Network) committed a small arms attack in Paktika Province, Afghanistan (the "May 19, 2002 Attack"). The May 19, 2002 Attack constituted an extrajudicial killing.

188.    **Staff Sergeant Gene Vance Jr.** served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SSG Vance was injured in the May 19, 2002 Attack. SSG Vance died on May 19, 2002, as a result of injuries sustained during the attack.

189.    SSG Vance was a U.S. national at the time of the attack and his death.

190.    Plaintiff Lisa Vance is the widow of SSG Vance and a U.S. national.

191.    Plaintiff Amber Vance is the daughter of SSG Vance and a U.S. national.

192.    As a result of the May 19, 2002 Attack and SSG Vance's injuries and death, each member of the Vance Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Vance's society, companionship, and counsel.

193.    As a result of the May 19, 2002 Attack, SSG Vance was injured in his person and/or property. The Plaintiff members of the Vance Family are the survivors and/or heirs of SSG Vance and are entitled to recover for the damages SSG Vance sustained.

### C.    The July 27, 2002 Complex Attack in Khost (Speer Family)

194.    On July 27, 2002, the Taliban (including its Haqqani Network) committed a complex attack involving grenades and small arms fire in Khost Province, Afghanistan (the "July 27, 2002 Attack"). The July 27, 2002 Attack constituted an extrajudicial killing.

195.    **Sergeant First Class Christopher Speer** served in Afghanistan as a member of the U.S. Army at the time of the attack. SFC Speer was injured in the July 27, 2002 Attack. SFC Speer died on August 7, 2002, as a result of injuries sustained during the attack.

196.    SFC Speer was a U.S. national at the time of the attack and his death.

197.    Plaintiff Betty Speer is the mother of SFC Speer and a U.S. national.

198.    Plaintiff Stephen Speer is the brother of SFC Speer and a U.S. national.

199.    As a result of the July 27, 2002 Attack and SFC Speer's injuries and death, each member of the Speer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Speer's society, companionship, and counsel.

200.    As a result of the July 27, 2002 Attack, SFC Speer was injured in his person and/or property. The Plaintiff members of the Speer Family are the survivors and/or heirs of SFC Speer and are entitled to recover for the damages SFC Speer sustained.

### D.    The April 25, 2003 Small Arms Attack in Paktika (Losano Family)

201.    On April 25, 2003, the Taliban (including its Haqqani Network) committed a small arms attack in Paktika Province, Afghanistan (the "April 25, 2003 Attack"). The April 25, 2003 Attack constituted an extrajudicial killing.

202.    Airman First Class Raymond Losano served in Afghanistan as a member of the U.S. Air Force at the time of the attack. A1C Losano was injured in the April 25, 2003 Attack. A1C Losano died on April 25, 2003, as a result of injuries sustained during the attack.

203.    A1C Losano was a U.S. national at the time of the attack and his death.

204.    Plaintiff Sarah Losano is the widow of A1C Losano and a U.S. national.

205.    Plaintiff Alorah Losano is the daughter of A1C Losano and a U.S. national.

206.    Plaintiff Lillian Losano is the daughter of A1C Losano and a U.S. national.

207.    Plaintiff Melinda Hernandez is the sister of A1C Losano and a U.S. national.

208.    As a result of the April 25, 2003 Attack and A1C Losano's injuries and death, each member of the Losano Family has experienced severe mental anguish, emotional pain and suffering, and the loss of A1C Losano's society, companionship, and counsel.

209.    As a result of the April 25, 2003 Attack, A1C Losano was injured in his person and/or property. The Plaintiff members of the Losano Family are the survivors and/or heirs of A1C Losano and are entitled to recover for the damages A1C Losano sustained.

### E.    The June 25, 2003 Hostile Fire Attack in Paktia (Retzer Family)

210.    On June 25, 2003, the Taliban (including its Haqqani Network) committed a hostile fire attack in Paktia Province, Afghanistan (the "June 25, 2003 Attack"). The June 25, 2003 Attack constituted an extrajudicial killing.

211.    Petty Officer First Class Thomas Retzer served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO1 Retzer was injured in the June 25, 2003 Attack. PO1 Retzer died on June 26, 2003, as a result of injuries sustained during the attack.

212.    PO1 Retzer was a U.S. national at the time of the attack and his death.

213.    Plaintiff Courtney Vargo is the widow of PO1 Retzer and a U.S. national.

214.    Plaintiff Leif Retzer is the son of PO1 Retzer and a U.S. national.

215.    Plaintiff Owen Retzer is the son of PO1 Retzer and a U.S. national.

216.    As a result of the June 25, 2003 Attack and PO1 Retzer's injuries and death, each member of the Retzer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Retzer's society, companionship, and counsel.

217.    As a result of the June 25, 2003 Attack, PO1 Retzer was injured in his person and/or property. The Plaintiff members of the Retzer Family are the survivors and/or heirs of PO1 Retzer and are entitled to recover for the damages PO1 Retzer sustained.

## F.    The October 30, 2003 Hostile Fire Attack in Helmand (Sweeney Family)

218.    On October 30, 2003, the Taliban committed a hostile fire attack in Helmand Province, Afghanistan (the "October 30, 2003 Attack"). The October 30, 2003 Attack constituted an extrajudicial killing.

219.    Staff Sergeant Paul Sweeney served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Sweeney was injured in the October 30, 2003 Attack. SSG Sweeney died on October 30, 2003, as a result of injuries sustained during the attack.

220.    SSG Sweeney was a U.S. national at the time of the attack and his death.

221.    Plaintiff Kristen Sweeney is the widow of SSG Sweeney and a U.S. national.

222.    Plaintiff Ryan Sweeney is the son of SSG Sweeney and a U.S. national.

223.    As a result of the October 30, 2003 Attack and SSG Sweeney's injuries and death, each member of the Sweeney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Sweeney's society, companionship, and counsel.

224.    As a result of the October 30, 2003 Attack, SSG Sweeney was injured in his person and/or property. The Plaintiff members of the Sweeney Family are the survivors and/or heirs of SSG Sweeney and are entitled to recover for the damages SSG Sweeney sustained.

### G.    The February 13, 2004 Anti-Tank Mine Attack in Ghazni (Golding Family)

225.    On February 13, 2004, the Taliban committed an anti-tank mine attack in Ghazni Province, Afghanistan (the "February 13, 2004 Attack"). The February 13, 2004 Attack constituted an extrajudicial killing.

226.    Sergeant Nicholes Golding served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Golding was injured in the February 13, 2004 Attack. SGT Golding died on February 13, 2004, as a result of injuries sustained during the attack.

227.    SGT Golding was a U.S. national at the time of the attack and his death.

228.    Plaintiff Holly Redimarker is the sister of SGT Golding and a U.S. national.

229.    As a result of the February 13, 2004 Attack and SGT Golding's injuries and death, each member of the Golding Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Golding's society, companionship, and counsel.

230.    As a result of the February 13, 2004 Attack, SGT Golding was injured in his person and/or property. The Plaintiff members of the Golding Family are the survivors and/or heirs of SGT Golding and are entitled to recover for the damages SGT Golding sustained.

### H.    The May 15, 2004 Complex Attack in Helmand (Price Family)

231.    On May 15, 2004, the Taliban committed a complex attack involving a rocket propelled grenade and small arms fire in Helmand Province, Afghanistan (the "May 15, 2004 Attack"). The May 15, 2004 Attack constituted an extrajudicial killing.

232.    Chief Warrant Officer 3 Bruce Price served in Afghanistan as a member of the U.S. Army at the time of the attack. CW3 Price was injured in the May 15, 2004 Attack. CW3 Price died on May 15, 2004, as a result of injuries sustained during the attack.

233.    CW3 Price was a U.S. national at the time of the attack and his death.

234.    Plaintiff Aidan Price is the son of CW3 Price and a U.S. national.

235.    As a result of the May 15, 2004 Attack and CW3 Price's injuries and death, each member of the Price Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW3 Price's society, companionship, and counsel.

236.    As a result of the May 15, 2004 Attack, CW3 Price was injured in his person and/or property. The Plaintiff members of the Price Family are the survivors and/or heirs of CW3 Price and are entitled to recover for the damages CW3 Price sustained.

I.    **The May 29, 2004 IED Attack in Zabul (Mogensen and Ouellette Families)**

237.    On May 29, 2004, the Taliban committed an IED attack in Zabul Province, Afghanistan (the "May 29, 2004 Attack"). The May 29, 2004 Attack constituted an extrajudicial killing.

238.    Staff Sergeant Robert Mogensen served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Mogensen was injured in the May 29, 2004 Attack. SSG Mogensen died on May 29, 2004, as a result of injuries sustained during the attack.

239.    SSG Mogensen was a U.S. national at the time of the attack and his death.

240.    Plaintiff William Mogensen is the father of SSG Mogensen and a U.S. national.

241.    As a result of the May 29, 2004 Attack and SSG Mogensen's injuries and death, each member of the Mogensen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mogensen's society, companionship, and counsel.

242.    As a result of the May 29, 2004 Attack, SSG Mogensen was injured in his person and/or property. The Plaintiff members of the Mogensen Family are the survivors and/or heirs of SSG Mogensen and are entitled to recover for the damages SSG Mogensen sustained.

243.    Petty Officer First Class Brian Ouellette served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO1 Ouellette was injured in the May 29, 2004 Attack. PO1 Ouellette died on May 29, 2004, as a result of injuries sustained during the attack.

244.    PO1 Ouellette was a U.S. national at the time of the attack and his death.

245.    Plaintiff Margaret Ouellette is the mother of PO1 Ouellette and a U.S. national.

246.    Plaintiff John Ouellette is the brother of PO1 Ouellette and a U.S. national.

247.    As a result of the May 29, 2004 Attack and PO1 Ouellette's injuries and death, each member of the Ouellette Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Ouellette's society, companionship, and counsel.

248.    As a result of the May 29, 2004 Attack, PO1 Ouellette was injured in his person and/or property. The Plaintiff members of the Ouellette Family are the survivors and/or heirs of PO1 Ouellette and are entitled to recover for the damages PO1 Ouellette sustained.

**J.    The June 7, 2004 IED Attack in Kandahar (Fraise Family)**

249.    On June 7, 2004, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "June 7, 2004 Attack"). The June 7, 2004 Attack constituted an extrajudicial killing.

250.    Corporal David Fraise served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Fraise was injured in the June 7, 2004 Attack. CPL Fraise died on June 7, 2004, as a result of injuries sustained during the attack.

251.    CPL Fraise was a U.S. national at the time of the attack and his death.

252.    Plaintiff Jenniece Fraise is the widow of CPL Fraise and a U.S. national.

253.    Plaintiff Jireh Fraise is the daughter of CPL Fraise and a U.S. national.

254.    Plaintiff Juanita Fraise is the mother of CPL Fraise and a U.S. national.

255.    As a result of the June 7, 2004 Attack and CPL Fraise's injuries and death, each member of the Fraise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Fraise's society, companionship, and counsel.

256.    As a result of the June 7, 2004 Attack, CPL Fraise was injured in his person and/or property. The Plaintiff members of the Fraise Family are the survivors and/or heirs of CPL Fraise and are entitled to recover for the damages CPL Fraise sustained.

### K.    The August 7, 2004 IED Attack in Ghazni (Beasley Family)

257.    On August 7, 2004, the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "August 7, 2004 Attack"). The August 7, 2004 Attack constituted an extrajudicial killing.

258.    Sergeant Bobby Beasley served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Beasley was injured in the August 7, 2004 Attack. SGT Beasley died on August 7, 2004, as a result of injuries sustained during the attack.

259.    SGT Beasley was a U.S. national at the time of the attack and his death.

260.    Plaintiff Juanita Beasley is the widow of SGT Beasley and a U.S. national.

261.    As a result of the August 7, 2004 Attack and SGT Beasley's injuries and death, each member of the Beasley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Beasley's society, companionship, and counsel.

262.     As a result of the August 7, 2004 Attack, SGT Beasley was injured in his person and/or property. The Plaintiff members of the Beasley Family are the survivors and/or heirs of SGT Beasley and are entitled to recover for the damages SGT Beasley sustained.

### L.     The September 20, 2004 Small Arms Attack in Paktika (Wells Family)

263.     On September 20, 2004, the Taliban (including its Haqqani Network) committed a small arms attack in Paktika Province, Afghanistan (the "September 20, 2004"). The September 20, 2004 Attack constituted an extrajudicial killing.

264.     Specialist Wesley Wells served in Afghanistan as a member of the U.S. Army at the time of the attack. SPC Wells was injured in the September 20, 2004 Attack. SPC Wells died on September 20, 2004, as a result of injuries sustained during the attack.

265.     SPC Wells was a U.S. national at the time of the attack and his death.

266.     Plaintiff Joan Neal is the mother of SPC Wells and a U.S. national.

267.     Plaintiff Tiffany Allegretti is the sister of SPC Wells and a U.S. national.

268.     Plaintiff Heather Koenig is the sister of SPC Wells and a U.S. national.

269.     As a result of the September 20, 2004 Attack and SPC Wells' injuries and death, each member of the Wells Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Wells' society, companionship, and counsel.

270.     As a result of the September 20, 2004 Attack, SPC Wells was injured in his person and/or property. The Plaintiff members of the Wells Family are the survivors and/or heirs of SPC Wells and are entitled to recover for the damages SPC Wells sustained.

**M.    The October 14, 2004 IED Attack in Oruzgan (Fernandez Family)**

271.    On October 14, 2004, the Taliban committed an IED attack in Oruzgan Province, Afghanistan (the "October 14, 2004 Attack"). The October 14, 2004 Attack constituted an extrajudicial killing.

272.    Corporal Kyle Fernandez served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Fernandez was injured in the October 14, 2004 Attack. CPL Fernandez died on October 14, 2004, as a result of injuries sustained during the attack.

273.    CPL Fernandez was a U.S. national at the time of the attack and his death.

274.    Plaintiff Renald Fernandez is the father of CPL Fernandez and a U.S. national.

275.    As a result of the October 14, 2004 Attack and CPL Fernandez's injuries and death, each member of the Fernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Fernandez's society, companionship, and counsel.

276.    As a result of the October 14, 2004 Attack, CPL Fernandez was injured in his person and/or property. The Plaintiff members of the Fernandez Family are the survivors and/or heirs of CPL Fernandez and are entitled to recover for the damages CPL Fernandez sustained.

**N.    The January 3, 2005 IED Attack in Kunar (Wright Family)**

277.    On January 3, 2005, al-Qaeda and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "January 3, 2005 Attack"). The January 3, 2005 Attack constituted an extrajudicial killing.

278.    Sergeant Jeremy Wright served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Wright was injured in the January 3, 2005 Attack. SGT Wright died on January 3, 2005, as a result of injuries sustained during the attack.

279.    SGT Wright was a U.S. national at the time of the attack and his death.

280.    Plaintiff Dale Wright is the father of SGT Wright and a U.S. national.

281.    As a result of the January 3, 2005 Attack and SGT Wright's injuries and death, each member of the Wright Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Wright's society, companionship, and counsel.

282.    As a result of the January 3, 2005 Attack, SGT Wright was injured in his person and/or property. The Plaintiff members of the Wright Family are the survivors and/or heirs of SGT Wright and are entitled to recover for the damages SGT Wright sustained.

**O.    The March 16, 2005 Land Mine Attack in Herat (Koele Family)**

283.    On March 16, 2005, the Taliban committed a land mine attack in Herat Province, Afghanistan (the "March 16, 2005 Attack"). The March 16, 2005 Attack constituted an extrajudicial killing.

284.    Staff Sergeant Shane Koele served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Koele was injured in the March 16, 2005 Attack. SSG Koele died on March 16, 2005, as a result of injuries sustained during the attack.

285.    SSG Koele was a U.S. national at the time of the attack and his death.

286.    Plaintiff Keith Koele is the father of SSG Koele and a U.S. national.

287.    As a result of the March 16, 2005 Attack and SSG Koele's injuries and death, each member of the Koele Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Koele's society, companionship, and counsel.

288.    As a result of the March 16, 2005 Attack, SSG Koele was injured in his person and/or property. The Plaintiff members of the Koele Family are the survivors and/or heirs of SSG Koele and are entitled to recover for the damages SSG Koele sustained.

**P.    The March 26, 2005 IED Attack in Logar (Fiscus Family)**

289.    On March 26, 2005, the Taliban committed an IED attack in Logar Province, Afghanistan (the "March 26, 2005 Attack"). The March 26, 2005 Attack constituted an extrajudicial killing.

290.    Captain Michael Fiscus served in Afghanistan as a member of the U.S. Army at the time of the attack. CPT Fiscus was injured in the March 26, 2005 Attack. CPT Fiscus died on March 26, 2005, as a result of injuries sustained during the attack.

291.    CPT Fiscus was a U.S. national at the time of the attack and his death.

292.    Plaintiff Paula Fiscus is the widow of CPT Fiscus and a U.S. national.

293.    Plaintiff Alexandra Fiscus is the daughter of CPT Fiscus and a U.S. national.

294.    As a result of the March 26, 2005 Attack and CPT Fiscus's injuries and death, each member of the Fiscus Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Fiscus's society, companionship, and counsel.

295.    As a result of the March 26, 2005 Attack, CPT Fiscus was injured in his person and/or property. The Plaintiff members of the Fiscus Family are the survivors and/or heirs of CPT Fiscus and are entitled to recover for the damages CPT Fiscus sustained.

**Q.    The June 3, 2005 IED Attack in Paktika (Alexander Family)**

296.    On June 3, 2005, the Taliban (including its Haqqani Network) committed an IED attack in Paktika Province, Afghanistan (the "June 3, 2005 Attack"). The June 3, 2005 Attack constituted an extrajudicial killing.

297.    Staff Sergeant Leroy Alexander served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Alexander was injured in the June 3, 2005 Attack. SSG Alexander died on June 3, 2005, as a result of injuries sustained during the attack.

298.    SSG Alexander was a U.S. national at the time of the attack and his death.

299.    Plaintiff Felecia Alexander is the mother of SSG Alexander and a U.S. national.

300.    Plaintiff Reginald Alexander is the brother of SSG Alexander and a U.S. national.

301.    As a result of the June 3, 2005 Attack and SSG Alexander's injuries and death, each member of the Alexander Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Alexander's society, companionship, and counsel.

302.    As a result of the June 3, 2005 Attack, SSG Alexander was injured in his person and/or property. The Plaintiff members of the Alexander Family are the survivors and/or heirs of SSG Alexander and are entitled to recover for the damages SSG Alexander sustained.

### R.    The June 8, 2005 Mortar Attack in Paktika (Kelley Family)

303.    On June 8, 2005, the Taliban (including its Haqqani Network) committed a mortar attack in Paktika Province, Afghanistan (the "June 8, 2005 Attack"). The June 8, 2005 Attack constituted an extrajudicial killing.

304.    Sergeant Michael Kelley served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Kelley was injured in the June 8, 2005 Attack. SGT Kelley died on June 8, 2005, as a result of injuries sustained during the attack.

305.    SGT Kelley was a U.S. national at the time of the attack and his death.

306.    Plaintiff Karen Kelley is the mother of SGT Kelley and a U.S. national.

307.    Plaintiff Joseph Kelley is the father of SGT Kelley and a U.S. national.

308.    Plaintiff Colleen Dugan is the sister of SGT Kelley and a U.S. national.

309.    Plaintiff Karianne Golemme is the sister of SGT Kelley and a U.S. national.

310.    Plaintiff Shawn Kelley is the brother of SGT Kelley and a U.S. national.

311.    As a result of the June 8, 2005 Attack and SGT Kelley's injuries and death, each member of the Kelley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kelley's society, companionship, and counsel.

312.    As a result of the June 8, 2005 Attack, SGT Kelley was injured in his person and/or property. The Plaintiff members of the Kelley Family are the survivors and/or heirs of SGT Kelley and are entitled to recover for the damages SGT Kelley sustained.

**S.    The June 28, 2005 Small Arms Attack in Kunar (Axelson Family)**

313.    On June 28, 2005, al-Qaeda and the Taliban committed a small arms attack in Kunar Province, Afghanistan (the "June 28, 2005 Small Arms Attack"). The June 28, 2005 Small Arms Attack constituted an extrajudicial killing.

314.    Petty Officer Second Class Matthew Axelson served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO2 Axelson was injured in the June 28, 2005 Small Arms Attack. PO2 Axelson died on June 28, 2005, as a result of injuries sustained during the attack.

315.    PO2 Axelson was a U.S. national at the time of the attack and his death.

316.    Plaintiff Jeffrey Axelson is the brother of PO2 Axelson and a U.S. national.

317.    As a result of the June 28, 2005 Small Arms Attack and PO2 Axelson's injuries and death, each member of the Axelson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Axelson's society, companionship, and counsel.

318.    As a result of the June 28, 2005 Small Arms Attack, PO2 Axelson was injured in his person and/or property. The Plaintiff members of the Axelson Family are the survivors and/or heirs of PO2 Axelson and are entitled to recover for the damages PO2 Axelson sustained.

**T.    The June 28, 2005 Helicopter Attack in Kunar (Fontan, Lucas, and McGreevy Families)**

319.    On June 28, 2005, al-Qaeda and the Taliban committed an attack on a helicopter in Kunar Province, Afghanistan (the "June 28, 2005 Helicopter Attack"). The June 28, 2005 Helicopter Attack constituted an extrajudicial killing.

320.    Chief Petty Officer Jacques Fontan served in Afghanistan as a member of the U.S. Navy at the time of the attack. CPO Fontan was injured in the June 28, 2005 Helicopter Attack. CPO Fontan died on June 28, 2005, as a result of injuries sustained during the attack.

321.    CPO Fontan was a U.S. national at the time of the attack and his death.

322.    Plaintiff Cheri Skop is the sister of CPO Fontan and a U.S. national.

323.    As a result of the June 28, 2005 Helicopter Attack and CPO Fontan's injuries and death, each member of the Fontan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Fontan's society, companionship, and counsel.

324.    As a result of the June 28, 2005 Helicopter Attack, CPO Fontan was injured in his person and/or property. The Plaintiff members of the Fontan Family are the survivors and/or heirs of CPO Fontan and are entitled to recover for the damages CPO Fontan sustained.

325.    Petty Officer First Class Jeffery Lucas served in Afghanistan as a member of the U.S. Navy at the time of the attack. PO1 Lucas was injured in the June 28, 2005 Helicopter Attack. PO1 Lucas died on June 28, 2005, as a result of injuries sustained during the attack.

326.    PO1 Lucas was a U.S. national at the time of the attack and his death.

327.    Plaintiff Rhonda Lucas is the widow of PO1 Lucas and a U.S. national.

328.    Plaintiff Seth Lucas is the son of PO1 Lucas and a U.S. national.

329.    As a result of the June 28, 2005 Helicopter Attack and PO1 Lucas's injuries and death, each member of the Lucas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Lucas's society, companionship, and counsel.

330.    As a result of the June 28, 2005 Helicopter Attack, PO1 Lucas was injured in his person and/or property. The Plaintiff members of the Lucas Family are the survivors and/or heirs of PO1 Lucas and are entitled to recover for the damages PO1 Lucas sustained.

331.    Lieutenant Michael McGreevy Jr. served in Afghanistan as a member of the U.S. Navy at the time of the attack. LT McGreevy was injured in the June 28, 2005 Helicopter Attack. LT McGreevy died on June 28, 2005, as a result of injuries sustained during the attack.

332.    LT McGreevy was a U.S. national at the time of the attack and his death.

333.    Plaintiff Michael McGreevy Sr. is the father of LT McGreevy and a U.S. national.

334.    Plaintiff Kate Wildern is the stepsister of LT McGreevy and a U.S. national. Ms. Wildern lived in the same household as LT McGreevy for a substantial period of time and considered LT McGreevy the functional equivalent of a biological brother.

335.    As a result of the June 28, 2005 Helicopter Attack and LT McGreevy's injuries and death, each member of the McGreevy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LT McGreevy's society, companionship, and counsel.

336.    As a result of the June 28, 2005 Helicopter Attack, LT McGreevy was injured in his person and/or property. The Plaintiff members of the McGreevy Family are the survivors and/or heirs of LT McGreevy and are entitled to recover for the damages LT McGreevy sustained.

U.    **The July 25, 2005 Small Arms Attack in Oruzgan (Schafer Family)**

337.    On July 25, 2005, the Taliban committed a small arms attack in Oruzgan Province, Afghanistan (the "July 25, 2005 Attack"). The July 25, 2005 Attack constituted an extrajudicial killing.

338.    Staff Sergeant Michael Schafer served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Schafer was injured in the July 25, 2005 Attack. SSG Schafer died on July 25, 2005, as a result of injuries sustained during the attack.

339.    SSG Schafer was a U.S. national at the time of the attack and his death.

340.    Plaintiff Timothy Barr is the brother of SSG Schafer and a U.S. national.

341.    As a result of the July 25, 2005 Attack and SSG Schafer's injuries and death, each member of the Schafer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schafer's society, companionship, and counsel.

342.    As a result of the July 25, 2005 Attack, SSG Schafer was injured in his person and/or property. The Plaintiff members of the Schafer Family are the survivors and/or heirs of SSG Schafer and are entitled to recover for the damages SSG Schafer sustained.

V.    **The August 11, 2005 IED Attack in Balkh (Heselton Family)**

343.    On August 11, 2005, the Taliban committed an IED attack in Balkh Province, Afghanistan (the "August 11, 2005 Attack"). The August 11, 2005 Attack constituted an extrajudicial killing.

344.    Sergeant Edward Heselton served in Afghanistan as a member of the U.S. Army Reserve at the time of the attack. SGT Heselton was injured in the August 11, 2005. SGT Heselton died on August 11, 2005, as a result of injuries sustained during the attack.

345.    SGT Heselton was a U.S. national at the time of the attack and his death.

346.    Plaintiff Andrew Heselton is the brother of SGT Heselton and a U.S. national.

347.    Plaintiff Carla Heselton is the sister of SGT Heselton and a U.S. national.

348.    Plaintiff Charles Heselton is the brother of SGT Heselton and a U.S. national.

349.    As a result of the August 11, 2005 Attack and SGT Heselton's injuries and death, each member of the Heselton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Heselton's society, companionship, and counsel.

350.    As a result of the August 11, 2005 Attack, SGT Heselton was injured in his person and/or property. The Plaintiff members of the Heselton Family are the survivors and/or heirs of SGT Heselton and are entitled to recover for the damages SGT Heselton sustained.

**W.    The August 21, 2005 IED Attack in Zabul (Lehmiller Family)**

351.    On August 21, 2005, the Taliban committed an IED attack in Zabul Province, Afghanistan (the "August 21, 2005 Attack"). The August 21, 2005 Attack constituted an extrajudicial killing.

352.    Sergeant Michael Lehmiller served in Afghanistan as a member of the U.S. Army at the time of the attack. SGT Lehmiller was injured in the August 21, 2005 Attack. SGT Lehmiller died on August 21, 2005, as a result of injuries sustained during the attack.

353.    SGT Lehmiller was a U.S. national at the time of the attack and his death.

354.    Plaintiff Gail Michaels is the mother of SGT Lehmiller and a U.S. national.

355.    Plaintiff Elliott Lehmiller is the brother of SGT Lehmiller and a U.S. national.

356.    Plaintiff William Lehmiller is the brother of SGT Lehmiller and a U.S. national.

357.    Plaintiff Chirstie Nesbit is the stepsister of SGT Lehmiller and a U.S. national. Ms. Nesbit lived in the same household as SGT Lehmiller for a substantial period of time and considered SGT Lehmiller the functional equivalent of a biological brother.

358.    As a result of the August 21, 2005 Attack and SGT Lehmiller's injuries and death, each member of the Lehmiller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Lehmiller's society, companionship, and counsel.

359.    As a result of the August 21, 2005 Attack, SGT Lehmiller was injured in his person and/or property. The Plaintiff members of the Lehmiller Family are the survivors and/or heirs of SGT Lehmiller and are entitled to recover for the damages SGT Lehmiller sustained.

## X.    The September 25, 2005 Helicopter Attack in Zabul (Stewart Family)

360.    On September 25, 2005, the Taliban committed an attack on a helicopter in Zabul Province, Afghanistan (the "September 25, 2005 Attack"). The September 25, 2005 Attack constituted an extrajudicial killing.

361.    Sergeant Patrick Stewart served in Afghanistan as a member of the U.S. Army National Guard at the time of the attack. SGT Stewart was injured in the September 25, 2005 Attack. SGT Stewart died on September 25, 2005, as a result of injuries sustained during the attack.

362.    SGT Stewart was a U.S. national at the time of the attack and his death.

363.    Plaintiff Roberta Maxwell is the widow of SGT Stewart and a U.S. national.

364.    As a result of the September 25, 2005 Attack and SGT Stewart's injuries and death, each member of the Stewart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stewart's society, companionship, and counsel.

365.    As a result of the September 25, 2005 Attack, SGT Stewart was injured in his person and/or property. The Plaintiff members of the Stewart Family are the survivors and/or heirs of SGT Stewart and are entitled to recover for the damages SGT Stewart sustained.

**Y.      The October 9, 2005 Grenade Attack in Zabul (Ezernack Family)**

366.     On October 9, 2005, the Taliban committed a grenade attack in Zabul Province, Afghanistan (the "October 9, 2005 Attack"). The October 9, 2005 Attack constituted an extrajudicial killing.

367.     Staff Sergeant Troy Ezernack served in Afghanistan as a member of the U.S. Army at the time of the attack. SSG Ezernack was injured in the October 9, 2005 Attack. SSG Ezernack died on October 9, 2005, as a result of injuries sustained during the attack.

368.     SSG Ezernack was a U.S. national at the time of the attack and his death.

369.     Plaintiff Jason Ezernack is the brother of SSG Ezernack and a U.S. national.

370.     As a result of the October 9, 2005 Attack and SSG Ezernack's injuries and death, each member of the Ezernack Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Ezernack's society, companionship, and counsel.

371.     As a result of the October 9, 2005 Attack, SSG Ezernack was injured in his person and/or property. The Plaintiff members of the Ezernack Family are the survivors and/or heirs of SSG Ezernack and are entitled to recover for the damages SSG Ezernack sustained.

**Z.      The November 22, 2005 IED Attack in Paktia (Steyart Family)**

372.     On November 22, 2005, the Taliban (including its Haqqani Network) committed an IED attack in Paktia Province, Afghanistan (the "November 22, 2005 Attack"). The November 22, 2005 Attack constituted an extrajudicial killing.

373.     Corporal Matthew Steyart served in Afghanistan as a member of the U.S. Army at the time of the attack. CPL Steyart was injured in the November 22, 2005 Attack. CPL Steyart died on November 22, 2005, as a result of injuries sustained during the attack.

374.     CPL Steyart was a U.S. national at the time of the attack and his death.

375.    Plaintiff Nancy Patrick is the mother of CPL Steyart and a U.S. national.

376.    Plaintiff Samantha Bunn is the sister of CPL Steyart and a U.S. national.

377.    Plaintiff Denise Lloyd is the sister of CPL Steyart and a U.S. national.

378.    Plaintiff Robert Steyart is the brother of CPL Steyart and a U.S. national.

379.    As a result of the November 22, 2005 Attack and CPL Steyart's injuries and death, each member of the Steyart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Steyart's society, companionship, and counsel.

380.    As a result of the November 22, 2005 Attack, CPL Steyart was injured in his person and/or property. The Plaintiff members of the Steyart Family are the survivors and/or heirs of CPL Steyart and are entitled to recover for the damages CPL Steyart sustained.

## CLAIM FOR RELIEF

## COUNT ONE: PERSONAL INJURY OR DEATH UNDER 28 U.S.C. § 1605A(c)

381.    Plaintiffs incorporate all allegations in this Complaint.

382.    Plaintiffs suffered personal injury or death caused by terrorist acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts, and such acts or provision of material support or resources were committed by officials, employees, or agents of Iran while acting within the scope of their office, employment, or agency.

383.    The terrorist attacks that killed or injured Plaintiffs or their family members occurred in Afghanistan.

384.    Iran was designated as a State Sponsor of Terrorism at the time of the terrorist acts that killed or injured Plaintiffs, or the provision of material support or resources for such acts, occurred. Iran remains designated as a State Sponsor of Terrorism today.

385. At the time of the attacks from which Plaintiffs were killed or injured, Plaintiffs were U.S. nationals, members of the U.S. armed forces, and/or employees or contractors of the U.S. government acting within the scope of their employment.

386. Plaintiffs are currently nationals of the United States, members of the U.S. armed forces, employees or contractors of the United States government acting within the scope of their employment, or the legal representatives of one of the foregoing.

387. Iran's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public, warranting an award of punitive damages against Iran pursuant to 28 U.S.C. § 1605A(c).

388. As a result of Defendant Iran's liability under 28 U.S.C. § 1605A(c), Plaintiffs are entitled to recover compensatory damages, including, but not limited to, damages for their severe physical injuries, extreme mental anguish, pain and suffering, economic damages, and solatium damages, as well as punitive damages as determined by the trier of fact.

## PRAYER FOR RELIEF

389.    Plaintiffs request that the Court:

390.    Enter judgment against Iran, finding Iran liable under 28 U.S.C. § 1605A(c);

391.    Award Plaintiffs compensatory and punitive damages to the maximum extent

permitted by law, 28 U.S.C. § 1605A(c), including but not limited to pain and suffering,

economic damages, solatium damages, and punitive damages;

392.    Award Plaintiffs prejudgment interest.

393.    Award Plaintiffs their costs, expenses, and attorney's fees; and

394.    Award Plaintiffs any such further relief the Court deems just and proper.

Respectfully submitted,

Dated: May 2, 2025                          /s/ *Ryan R. Sparacino*

Ryan R. Sparacino (D.C. Bar No. 493700)
Anthony Asuncion (D.C. Bar No. 420822)
Raj Parekh (D.C. Bar No. 978214)
Shuman Sohrn (D.C. Bar. No. 90010140)
Adam J. Goldstein (*pro hac vice*
forthcoming)
Stacey L. Wilson (D.C. Bar No. 988892)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
anthony.asuncion@sparacinopllc.com
raj.parekh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com
adam.goldstein@sparacinopllc.com
stacey.wilson@sparacinopllc.com

*Counsel for Plaintiffs*

74